[ORAL ARGUMENT SCHEDULED FOR OCTOBER 18, 2013]

# No. 13-5223

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

════════════

**SHAKER ABDURRAHEEM AAMER, detainee, Camp Delta, and
SAEED AHMED SIDDIQUE, next friend of Shaker Abdurraheem Aamer,**
*Appellants,*

*v.*

**BARACK OBAMA, President of the United States of America, et al.,**
*Appellees.*

**Consolidated with Nos. 13-5224 & 13-5225**

════════════

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
1:04-CV-02215-RMC, 1:05-CV-01504-UNA, & 1:05-CV-02349-UNA

════════════

# BRIEF OF APPELLANTS

════════════

**JON B. EISENBERG**
1970 BROADWAY, SUITE 1200
OAKLAND, CALIFORNIA 94612
(510) 452-2581

**REPRIEVE**
CORI CRIDER
CLIVE STAFFORD SMITH
TARA MURRAY
P. O. BOX 72054
LONDON EC3P 3BZ, UNITED KINGDOM
011 44 207 553 8140

ATTORNEYS FOR APPELLANTS
**SHAKER AAMER, AHMED BELBACHA, AND NABIL HADJARAB**

# CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for appellants certify:

## (A)   Parties and Amici

The following are parties, intervenors or amici curiae appearing before the district court and in this Court:

### Case No. 13-5223

Appellants:  Shaker Aamer (petitioner), Saeed Ahmed Siddique (as next friend of Shaker Aamer), Omar Deghayes (detainee), Taher Deghayes (as next friend of Omar Deghayes), Jamel Abdullah Kiyemba (detainee), and Theresa Namuddu (next friend of Jamel Abdullah Kiyemba)

Appellees:  Department of Defense Privilege Team, George Walker Bush (President), Donald Rumsfeld (Sec., U.S. Dept. of Defense), Jay Hood (Army Brig. Gen.—Commander, Joint Task Force—GTMO), Mike Bumgarner (Army Col.—Joint Detention Operations Group), Barack Hussain Obama (President), and Nelson J. Cannon (Army Col.)

### Case No. 13-5224

Appellants:  Nabil Hadjarab (petitioner) and Jamaal Kiyemba (as next friend of Nabil Hadjarab)

Appellees:  Department of Defense Privilege Team, George Walker Bush (President), Donald Rumsfeld (Sec., U.S. Dept. of Defense), Jay Hood (Army Brig. Gen.—Commander, Joint Task Force—GTMO), Mike Bumgarner (Army Col.—Joint Detention Operations Group), Barack Hussain Obama (President), Nelson J. Cannon (Army Col.), Associated Press (movant), New York Times Company (movant), USA Today (movant)

## Case No. 13-5225

Appellants:  Ahmed Ben Bacha (petitioner) and Salah Belbacha (as next friend of Ahmed Ben Bacha)

Appellees: Department of Defense Privilege Team, George Walker Bush (President), Donald Rumsfeld (Sec., U.S. Dept. of Defense), Jay Hood (Army Brig. Gen.—Commander, Joint Task Force—GTMO), Mike Bumgarner (Army Col.—Joint Detention Operations Group), and Barack Hussain Obama (President)

**(B)   Rulings Under Review**

Appellants seek review of the July 16, 2013 Order and Opinion entered by the Honorable Rosemary M. Collyer, Judge of the United States District Court for the District of Columbia, denying motions by Shaker

Aamer, Nabil Hadjarab, and Ahmed Belbacha for a preliminary injunction. *See* Appendix (App.) 142-57.

**(C)  Related Cases**

One of the consolidated cases on review, No. 13-5225, was previously before this Court in *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008, No. 07-5258).

Simultaneously with appellants' motions in the district court, Guantánamo Bay detainee Abu Wa'el Dhiab filed an identical motion before the Honorable Gladys Kessler, Judge of the United States District Court for the District of Columbia, in *Dhiab v. Obama*, Case 1:05-CV-01457-UNA.  On July 8, 2013, Judge Kessler denied Dhiab's motion.  *See* App. 119-122.  Dhiab's motion for reconsideration of that ruling, *see* App. 123-30, is still pending in the district court.

Appellants' counsel are not aware of other cases that involve substantially the same parties and the same or similar issues.

August 5, 2013                    **JON B. EISENBERG**
                                  1970 Broadway, Suite 1200
                                  Oakland, CA 94612
                                  (510) 452-2581


                                  /s/
                                  _____
                                  Jon B. Eisenberg

August 5, 2013                    **REPRIEVE**
                                  Cori Crider
                                  Clive Stafford Smith
                                  Tara Murray
                                  P.O. Box 72054
                                  London EC3P 3BZ
                                  United Kingdom
                                  011 44 207 553 8140


                                  /s/
                                  _____
                                  Cori Crider

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES ........ i

TABLE OF AUTHORITIES .................................................... viii

GLOSSARY OF ABBREVIATIONS ...................................... xiv

JURISDICTIONAL STATEMENT ........................................ 1

STATEMENT OF THE ISSUES ............................................ 1

STATUTES AND REGULATIONS ........................................ 3

STATEMENT OF THE CASE ............................................... 5

STATEMENT OF THE FACTS ............................................. 8

    A.    The Regulations on Force-Feeding at Guantánamo Bay ....... 8

    B.    The Deprivation of the Ability to Pray Communally During Ramadan ................................................. 10

    C.    Appellants' Circumstances .................................... 12

        1.    Ahmed Belbacha ......................................... 12

        2.    Nabil Hadjarab ........................................... 14

        3.    Shaker Aamer ............................................ 14

        4.    Abu Wa'el Dhiab ........................................ 15

SUMMARY OF THE ARGUMENT ...................................... 17

ARGUMENT .................................................................. 19

I.    THE MILITARY COMMISSIONS ACT OF 2006 (MCA) DOES NOT BAR THE RELIEF SOUGHT HERE ................................... 19

A.  Because the MCA bars the courts from adjudicating non-habeas actions concerning conditions of confinement at Guantánamo Bay, habeas relief must be available to challenge conditions of confinement that deprive appellants of substantial rights ............................................ 19

B.  Habeas relief is also available to challenge appellants' force-feeding to the extent it involves a quantum change in their level of custody ........................................................ 24

C.  Habeas relief is also available to challenge force-feeding as a severe restraint on individual liberty ........................... 26

II.  THE GUANTÁNAMO BAY DETAINEES' FORCE-FEEDING IS NOT REASONABLY RELATED TO ANY LEGITIMATE PENOLOGICAL INTEREST ........................................................ 27

A.  The standard for determining the validity of the protocols on force-feeding of Guantánamo Bay detainees is whether those protocols are reasonably related to legitimate penological interests ............................................................ 27

B.  Appellants' detention has become indefinite ........................ 29

C.  There is no legitimate penological interest in force-feeding to prolong indefinite detention ................................ 30

D.  There is no legitimate penological interest in subjecting appellants to a painful invasive procedure that is inhumane, degrading, and a violation of medical ethics ...... 33

E.  The detainees' force-feeding cannot be justified by the interest in maintaining institutional security and discipline ................................................................................ 39

III.  THE DEPRIVATION OF THE DETAINEES' ABILITY TO PERFORM COMMUNAL RAMADAN PRAYERS VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT (RFRA) ..... 41

A.  The Guantánamo Bay detainees are "persons" protected by the RFRA ........................................................................ 41

B.     The Court should decide this issue because it is capable of repetition yet evading review ........................................... 44

IV.   APPELLANTS MEET THE CRITERIA FOR GRANTING A PRELIMINARY INJUNCTION.................................................... 45

CONCLUSION ......................................................................... 47

CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Al-Adahi v. Obama,*
  596 F. Supp. 2d 111 (D.D.C. 2009) .................................... 5, 19, 28, 40

*Al-Zahrani v. Rodriguez,*
  669 F.3d 315 (D.C. Cir. 2012) ........................................... 27

*Al-Zahrani v. Rumsfeld,*
  684 F. Supp. 2d 103 (D.D.C. 2010) ..................................... 19

*Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations
  Auth.,*
  283 F.3d 339 (D.C. Cir. 2002) ........................................... 20

*Bell v. Wolfish,*
  441 U.S. 520 (1979) .................................................. 23, 28

*Bivens v. Six Unknown Named Agents of Federal Bureau of
  Narcotics,*
  403 U.S. 338 (1971) ......................................... 17, 21, 22, 24

*Bluman v. FEC,*
  800 F. Supp. 2d 281 (D.D.C. 2011) ..................................... 42

*\*Boumediene v. Bush,*
  553 U.S. 723 (2008) ............................................ 20, 22, 23

*\*Citizens United v. FEC,*
  558 U.S. 310 (2010) ................................................. 42, 43

*Clarke v. United States,*
  915 F.2d 699 (D.C. Cir. 1990) ........................................... 44

*Freeman v. Berge,*
  441 F.3d 543 (7th Cir. 2006) ........................................... 39

***\*Authorities on which we chiefly rely are marked with asterisks***

*Glaus v. Anderson,
    408 F.3d 382 (7th Cir. 2005) ............................................................... 25

*Graham v. Broglin,
    922 F.2d 379 (7th Cir. 1991) ............................................................... 25

*Hensley v. Mun. Court, San Jose Milpitas Judicial Dist.,
    Santa Clara Cnty.
    411 U.S. 345 (1973) ............................................................................. 26

Hicks v. Bush,
    452 F. Supp. 2d 88 (D.D.C. 2006) ...................................................... 28

Klopfer v. N.C.,
    386 U.S. 213 (1967) ............................................................................. 30

Makin v. Colorado Dep't of Corrections,
    183 F.3d 1205 (10th Cir. 1999) .......................................................... 41

Matter of Bezio v. Dorsey,
    21 N.Y.3d 93 (2013) ............................................................................ 40

Murphy v. Hunt,
    455 U.S. 478 (1982) ............................................................................. 44

Preiser v. Rodriguez,
    411 U.S. 475 (1973) ............................................................................. 23

Rasul v. Myers,
    563 F.3d 527 (D.C. Cir. 2009) ............................................................ 42

Sell v. United States,
    539 U.S. 166 (2003) ............................................................................. 26

Sottera, Inc. v. Food & Drug Admin.,
    627 F.3d 891 (D.C. Cir. 2010) ...................................................... 29, 41

Taylor v. Roal,
    No. 10-cv-3588 (PJS/JJG), 2010 WL 4628634 (D. Minn.
    Nov. 5, 2010) ....................................................................................... 22

*Turner v. Safley*,
    482 U.S. 78 (1987)..................................................................27, 28

*\*Washington v. Harper*,
    494 U.S. 210 (1990)................................................................ 28, 40

*Weinstein v. Bradford*,
    423 U.S. 147 (1975)...................................................................... 44

*\*Willis v. Ciccone*,
    506 F.2d 1011 (8th Cir. 1974)................................................ 21, 22, 23

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................... 45

## Statutes

United States Code
    10 U.S.C. § 801 (Detainee Treatment Act of 2005)............................3
    28 U.S.C. § 1292(a)(1) .....................................................................1
    28 U.S.C. § 2241........................................................................... 19
    28 U.S.C. § 2241(e)(1) (Military Commission Act of 2006,
        Pub. L. No. 109-366, 120 Stat. 2600)........................... 3, 19, 20, 22
    *28 U.S.C. § 2241(e)(2) .......................3, 5, 6, 17, 19, 20, 21, 22, 23, 24
    *42 U.S.C. § 2000bb-1.............................................................. 41, 43
    *42 U.S.C. § 2000bb-1(a)................................................................ 4

## Miscellaneous

George J. Annas, Sondra S. Crosby & Leonard H. Glanz,
    *Guantánamo Bay: A Medical Ethics-free Zone?*, 369 NEW
    ENG. J. MED. 101 (2013) .................................................... 38

Associated Press, *U.S. Military says number of Guantánamo
    prisoners on hunger strike has dropped to 75 from 106*
    (July 18, 2013)...................................................................... 11

Cara M. Cheyette, Physicians for Human Rights,
    Punishment Before Justice:  Indefinite Detention in the
    US 2 (Scott Allen & Vincent Iacopino eds., 2011)............................31

Sir Edward Coke, The Second Part of the Institutes of the
Laws of England (Brooke ed., 5th ed. 1797)......................................30

Letter from Dianne Feinstein, Senator, to Honorable Chuck
Hagel, Sec'y of Def. (June 19, 2013),
http://www.feinstein.senate.gov/public/index.cfm/files/serv
e/?file_id=17585d46-c235-4f32-b957-50648d4e6252..........................39

Geneva Convention Relative to the Treatment of Prisoners of
War art. 3, Aug. 12, 1949, 75 U.N.T.S. 135.....................................35

Michael L. Gross, *Force-Feeding, Autonomy, and the Public
Interest*, NEW ENG. J. MED., 103 (2013)..................................36, 38, 40

Guantánamo:  hunger strikes and a doctor's duty, 381 THE
LANCET 1512 (2013) .......................................................................35

Int'l Comm. of the Red Cross, *Hunger strikes in prisons: the
ICRC's position* (2013) ....................................................................35

Int'l Covenant on Civ. & Pol. Rights art. 9 (1976).................................31

Joint Task Force Guantánamo Bay, Cuba, Joint Medical
Group, *Medical Management of Detainees on Hunger
Strike* (Mar. 5, 2013) .................................................................8, 9, 25

Letter from Jeremy A. Lazarus, M.D., President of Am. Med.
Ass'n, to Honorable Chuck Hagel, Sec'y of Def. (Apr. 25,
2013).................................................................................................35

Mohamed Haq Magid, Reflections on the Qur'an:  A
Ramadan Reader (2011) ...................................................................10

Samir Naji al Hasan Moqbel, *Gitmo Is Killing Me*, N.Y.
TIMES, Apr. 14, 2013 ........................................................................37

Letter from Most Reverend Richard E. Pates, Bishop of Des
Moines, to Honorable Chuck Hagel, Sec'y of Def. (June 25,
2013).................................................................................................33

Press Release, OHCHR, IACHR, UN Working Group on
    Arbitrary Detention, UN Rapporteur on Torture, UN
    Rapporteur on Human Rights and Counter-Terrorism,
    and UN Rapporteur on Health reiterate need to end the
    indefinite detention of individuals at Guantánamo Naval
    Base in light of current human rights crisis, U.N.H.R.
    Press Release (May 1, 2013), www.ohchr.org/en/news
    events/pages/displaynews.aspx?newsid=13278&langl ..................... 34

Carol Rosenberg, *Guantánamo: 25 Captives Quit Hunger
    Strike Since Ramadan,* MIAMI HERALD (July 14, 2013) ..................... 11

Dennis Sadowski, *Guantánamo Bay Prison poses moral
    dilemma for White House,* NATIONAL CATHOLIC REPORTER
    (June 29, 2013) ................................................................... 33

Charlie Savage, *15 Held at Guantánamo Are Said to Quit
    Hunger Strike*, N. Y. TIMES (July 14, 2013) ......................................... 11

Dr. Sayyid M. Syeed, *The Meaning of Tarawih*,
    http://www.nrcat.org/interfaith-campaign-to-address-anti-
    muslim-sentiment/background/the-meaning-of-tarawih ................... 10

United Nations Convention Against Torture and Other
    Cruel, Inhuman or Degrading Treatment, Dec. 10, 1984,
    1465 U.N.T.S. 85 ................................................................ 35

Univ. Decl. of Human Rights art. 9 (1948) ............................................. 31

World Medical Association, *WMA Declaration of Malta on
    Hunger Strikers* (1991) ......................................................... 34

World Medical Association, *WMA Declaration of Tokyo-
    Guidelines for Physicians Concerning Torture and other
    Cruel, Inhuman or Degrading Treatment or Punishment
    in Relation to Detention and Imprisonment* (1975) ........................... 34

Alfred de Zayas, *Human rights and indefinite detention*
    87 Int'l Rev. of the Red Cross 15 (2005) ........................................... 32

# GLOSSARY OF ABBREVIATIONS

Administrative Review Board                                ARB

Appendix                                                  App.

Department of Justice                                     DOJ

Forcible Cell Extraction                                  FCE

Guantánamo Review Task Force                              GRTF

Ideal Body Weight                                         IBW

International Covenant on Civil and Political Rights       ICCPR

Military Commissions Act of 2006                          MCA

Religious Freedom Restoration Act                         RFRA

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) to review the district court's Order of July 16, 2013, denying a preliminary injunction. Appellants filed timely notices of appeal from that Order on July 18, 2013.

The district court's subject-matter jurisdiction is disputed. Appellants contend the district court has jurisdiction to adjudicate habeas corpus actions by Guantánamo Bay detainees challenging (a) conditions of their confinement that deprive them of substantial rights, (b) a quantum change in their level of custody, and (c) a severe restraint on their individual liberty. *See infra* at 19-27.

## STATEMENT OF THE ISSUES

1.    Does the district court have jurisdiction to adjudicate habeas corpus actions by Guantánamo Bay detainees challenging (a) conditions of their confinement that deprive them of substantial rights, (b) a quantum change in their level of custody, or (c) a severe restraint on their individual liberty?

2.     Does force-feeding of the detainees in order to prolong their indefinite detention lack a reasonable relationship to a legitimate penological interest?

3.     Does the deprivation of the detainees' ability to perform communal prayers during Ramadan violate the Religious Freedom Restoration Act?

## STATUTES AND REGULATIONS

1.    The Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600, 28 U.S.C. § 2241(e)(1), provides: "No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

2.    The MCA, 28 U.S.C. § 2241(e)(2), provides: "Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

3.    The Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1(a), provides:

**(a)    In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b)    Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1)    is in furtherance of a compelling government interest; and

(2)    is the least restrictive means of furthering that compelling government interest.

**(c)    Judicial relief**

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## STATEMENT OF THE CASE

This appeal by Guantánamo Bay detainees Shaker Aamer, Ahmed Belbacha, and Nabil Hadjarab challenges the district court's denial of a preliminary injunction prohibiting appellees from (1) subjecting appellants to forcible nasogastric tube feeding, and (2) depriving appellants of their ability to perform communal prayers during the Islamic holy month of Ramadan.

Appellants and another Guantánamo Bay detainee, Abu Wa'el Dhiab, sought the injunction from two judges of the district court:  Dhiab filed his application with Judge Gladys Kessler, and appellants filed their applications with Judge Rosemary M. Collyer.  App. 1-29.

In a Memorandum Order filed July 8, 2013, Judge Kessler denied Dhiab's application, based on the judge's previous determination in *Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 117 (D.D.C. 2009), that 28 U.S.C. § 2241(e)(2), by depriving the district court of jurisdiction over actions relating to "conditions of confinement" at Guantánamo Bay, deprived the court of jurisdiction to grant the injunctive relief requested. App. 120.  On the merits, however, Judge Kessler commented that Dhiab's detention "has, for all practical purposes become indefinite," that "force-feeding is a

painful, humiliating, and degrading process," and that force-feeding of prisoners violates international law and medical ethics.  App. 120-21.

Judge Collyer, in an opinion filed on July 16, 2013, likewise found that jurisdiction was lacking.  App. 148-53.  On the merits, however, in contrast with Judge Kessler's decision, Judge Collyer commented that "there is nothing so shocking or inhumane in the treatment of Petitioners [by force-feeding] . . . to raise a constitutional concern that might otherwise necessitate review."  App. 148.

Appellants promptly filed notices of appeal from Judge Collyer's order and filed an emergency motion in this Court for an injunction during the pendency of the appeal.  This Court denied the emergency motion but consolidated and expedited the three appeals.

Meanwhile, Dhiab filed a motion for reconsideration of Judge Kessler's jurisdictional ruling.  App. 123-30.  Because that motion is still pending, Dhiab has not yet appealed.

In this brief, we explain three separate and independent reasons why jurisdiction is vested in the district court as well as in this Court: *First*, to the extent § 2241(e)(2) deprives the courts of jurisdiction to adjudicate actions by Guantánamo Bay detainees challenging conditions of their

6

confinement that constitute a deprivation of substantial rights, the statute is invalid as an unlawful suspension of the writ of habeas corpus. *Second*, habeas relief is available to appellants to challenge their force-feeding to the extent it involves a quantum change in their level of custody from communal living to isolation cells. *Third*, habeas relief is available to appellants to challenge their force-feeding to the extent it constitutes a severe restraint on their individual liberty.

On the merits, we explain why Judge Kessler was right: the force-feeding of the Guantánamo Bay detainees is indeed a painful, humiliating, and degrading process which violates international law and medical ethics. We also demonstrate that deprivation of the detainees' ability to perform communal prayers during Ramadan violates their rights of religious free exercise.

The detention facility at Guantánamo Bay has become a festering wound of human rights violations and a disgrace to American democracy. In this brief, we explain why this Court has jurisdiction to do something about it.

## STATEMENT OF THE FACTS

**A.    The Regulations on Force-Feeding at Guantánamo Bay.**

A 30-page document prescribes protocols for the force-feeding of hunger-striking detainees at Guantánamo Bay.  *See* Joint Task Force Guantánamo Bay, Cuba, Joint Medical Group, *Medical Management of Detainees on Hunger Strike* (Mar. 5, 2013) (hereinafter *Medical Management of Detainees*).  The document pronounces a policy that when a hunger striker refuses sustenance, "medical procedures that are indicated to preserve health and life shall be implemented without consent from the detainee."  *Id.* at 2.  Those "medical procedures" include forcible nasogastric tube feeding while the detainee is physically restrained in a specially-made chair.

Force-feeding will be considered if, among other things, "[t]here is a prolonged period of hunger strike (more than 21 days)" or "[t]he detainee is at a weight less than 85% of the calculated Ideal Body Weight (IBW)." *Medical Management of Detainees, supra* at 5.  "Intermittent enteral feedings are usually done two times a day." *Id.* at 18.  The detainee is shackled, a mask is placed over his mouth, and he "is escorted to the chair restraint system and is appropriately restrained by the guard force." *Id.*

8

"The feeding tube is passed via the nasal passage into the stomach," "[t]he tube is secured to the nose with tape," and the feeding is typically completed "over 20 to 30 minutes." *Id.* The detainee may be kept in the chair restraint system for as much as two hours after the force-feeding is completed. *Id.*

The force-feeding ceases only "[w]hen a hunger striking detainee voluntarily resumes eating or when the detainee has attained 100% of calculated IBW for at least fourteen (14) consecutive days and the attending physician deems it to be medically appropriate . . . ." *Medical Management of Detainees, supra* at 16. Detainees may be regularly force-fed "for a prolonged period of time," which is defined as generally exceeding 30 days. *Id.* at 3.

Force-feeding is imposed indirectly as well: The regimen for transporting the detainee and administering the feeding is so intrusive and painful that some detainees will accept a minimal amount of nutrition in order to avoid it. Aamer and Dhiab have chosen this course—Dhiab after a course of force-feeding during the current hunger strike, Aamer because of prior experience with force-feeding in earlier hunger strikes. App. 42, 46-48.

9

**B.    The Deprivation of the Ability to Pray Communally During Ramadan.**

During Ramadan, Muslims traditionally perform extra communal prayers—called *tarawih*—after each day's final evening prayer, by reciting portions of the Qur'an while standing, bowing, prostrating and sitting alongside each other.  *See, e.g.,* Mohamed Haq Magid, Reflections on the Qur'an:  A Ramadan Reader (2011) at 11-14.

Dr. Sayyid M. Syeed, National Director for Interfaith & Community Alliances and former General Secretary of the Islamic Society of North America, explains: "*Tarawih* is a prayer during which the entire Qur'an is recited throughout the month of Ramadan.  One-thirtieth of the Qur'an is recited each night during the 30 nights of the month.  Muslims typically arrange for someone with beautiful recitation to lead the prayer and chant the sacred scripture.  This is a special part of Ramadan tradition and is a collectively performed act of piety.  If a person were prevented from performing this highly valued and deeply spiritual practice, it would truly create a great sense of deprivation and distress."  Dr. Sayyid M. Syeed, *The Meaning of Tarawih*, http://www.nrcat.org/interfaith-campaign-to-address-anti-muslim-sentiment/background/the-meaning-of-tarawih.

10

On July 14, 2013, the McClatchy news service reported that 25 detainees had "quit their hunger strike during Ramadan" because appellees required them to do so in order to be permitted "to live in communal detention—where they can pray and eat in groups—after months alone in maximum-security lockdown . . . ." Carol Rosenberg, *Guantánamo: 25 Captives Quit Hunger Strike Since Ramadan,* MIAMI HERALD (July 14, 2013) at 2; *see also* Charlie Savage, *15 Held at Guantánamo Are Said to Quit Hunger Strike,* N. Y. TIMES (July 14, 2013) at 3 ("[a]t the start of Ramadan . . . the military began moving compliant detainees who were not participating in the hunger strike back into communal living conditions, where they could pray together."). On July 18, 2013, the Associated Press reported that Army Lt. Col. Sam House "said eating regular meals is 'a condition of communal living.'" Associated Press, *U.S. Military says number of Guantánamo prisoners on hunger strike has dropped to 75 from 106*, July 18, 2013, http://www.washingtonpost.com/world/the_americas/us-military-reports-drop-in-numbers-of-hunger-strikers-at-guantanamo-bay/2013/07/18/36f7b9de-efd8-11e2-8c36-0e868255a989_story.html.

The substance of these newspaper articles is confirmed by evidence appellants submitted to this Court on their emergency motion for an injunction pending appeal. This evidence included, for example, one detainee's statement that on July 11, 2013, he was told that if he did not stop hunger-striking he would be moved into isolation, that "[c]ommunal prayers are our tradition in Ramadan," and that "[m]y feeling is that they blackmailed me into taking food." App.'s Reply to Opp. to Emergency Motion for an Injunction Pending Appeal, Doc. 1448689, Exhibit A, at 3.

Thus, it is now evident that appellees have denied the Guantánamo Bay detainees their right to religious free exercise by depriving them of the ability to perform the communal *tarawih* prayer unless they stopped hunger-striking.

## C.    Appellants' Circumstances.

### 1.    Ahmed Belbacha.

Ahmed Belbacha is a citizen of Algeria and has been held at Guantánamo Bay since March 2002. He was first cleared for release in 2007 by the Defense Department's Administrative Review Board (ARB) process. The Obama Administration's Guantánamo Review Task Force (GRTF) also authorized him for transfer in 2009. App. 35.

12

Belbacha began striking sometime in February and was hospitalized on April 12, 2013. It is unclear exactly when force-feeding started, but the Department of Justice (DOJ) sent counsel an e-mail stating that force-feeding had begun on April 16, 2013. In a phone call with counsel on May 30, 2013, Belbacha said that he understood the risks of hunger-striking and wished the district court to order the government to cease force-feeding him. App. 35.

The force-feeding process causes Belbacha extreme pain. A prior nasal surgery makes intubation even more uncomfortable for him than in the usual case—one nostril has apparently swelled and cannot accept the tube at all. His requests for smaller-gauge tubes to lessen the pain yield exhortations to eat. App. 36.

Belbacha has tried to protest his force-feeding individually with the camp medical staff, but on each occasion has been told that the way he is treated—or whether he is fed at all—is not up to them. App. 37. His impression, from conversations with some of these staff, is that they are unseasoned. It appears, for some, to be their first experience of force-feeding prisoners. *Id.* The ordeal may prove as traumatic and damaging for these unfortunate military medics as it is for Belbacha.

13

## 2.    Nabil Hadjarab.

Nabil Hadjarab is an Algerian citizen and former French resident. His living relatives are French citizens and have requested that the French government accept him in honor of his family's history of French military service.  He was also cleared by the Bush administration ARB in 2007 and by the Obama-era GRTF in 2009.  App. 39-40.

In a telephone call on June 17, he said: "'For  years I never thought about being on hunger strike, but I am doing this because I want to know my destiny.  I cannot abide not knowing anymore.'"  App. 39.  While he does not wish to die, he adds, "'I am *prepared* to die because I believe there is no end-point to my imprisonment.'"  App. 40 (emphasis in original).

Hadjarab was among the first prisoners to be force-fed, on March 22, 2013.  App. 41.  He also finds the process degrading and painful, stating that the feeding chair "'reminds [him] of an execution chair.'"  App. 41. He, too, has sought to raise concerns with medical staff and has been rebuffed.  App. 42.

## 3.    Shaker Aamer.

Shaker Aamer is a Saudi national and British resident cleared by President Obama's GRTF, whose return to the United Kingdom has been

requested on several occasions by the UK government. Despite repeated requests from perhaps the United States' closest ally, he continues to be detained. Aamer is, like the others, on strike. Nonetheless, because of his prior experience with force-feeding and his family history of renal failure, he has elected to take a very small amount of nutrition each day. App. 42. He has nonetheless lost approximately 50 pounds, continually goes through "Forcible Cell Extractions" (FCEs), and states that if the force-feeding regimen were not in place, he would cease eating. App. 43.

### 4. Abu Wa'el Dhiab.

Abu Wa'el Dhiab, the petitioner in the proceeding before Judge Kessler, is a Syrian national. He was cleared for release by President Obama's GRTF in 2009, and DOJ notified his counsel of the force-feeding on April 9, 2013, although it is likely force-feeding began earlier than this. He has started taking liquid nutrition because of serious back pain from being forced into and out of the chair, but has stated that if force-feeding were enjoined he, too, would resume a total fast. App. 43-44. When counsel added that, were the motion successful, he would have the choice either to eat or to die, he stated: "'Of course I know the consequences of refusing the food. And I will not eat. Why do you think I am on hunger

15

strike in the first place?'" App. 45.  He stated he was prepared to take the

risk—having the choice to eat or not was the important thing.  *Id.*

He describes force-feeding as a degrading process:

>     Straps and shackles are put in place and only the chains
> on the hands are released.  Then all the straps are tightened
> forcefully so that I cannot move or breathe.  In addition to this,
> there are six riot force members:  one holding the head and
> putting his fingers on the throat and neck from below the chin
> with severe pressure, the second and third hold the hands, the
> fourth and fifth hold the legs, and then the nurse inserts the
> tube.  If you are in pain it is natural for your head to move, so
> they shout "don't resist."

App. 46.  His concluding words on the subject were as follows:  "The issue

now is:  why am I here? We have heard all of this before. The lawyers have

been with us for four years and still the government does not want to

release us. They are just giving us anesthesia to wait — but there is no

action."  App. 48.

16

## SUMMARY OF THE ARGUMENT

1.     (a)     The district court has habeas jurisdiction to adjudicate challenges by Guantánamo Bay detainees to conditions of their confinement that deprive them of *substantial rights*.  Such jurisdiction exists because 28 U.S.C. § 2241(e)(2) precludes *Bivens* actions to challenge the conditions of their confinement, the consequence of which is to make habeas relief their only recourse to secure substantial rights.  To whatever extent the provisions of § 2241(e)(2) might be construed as purporting to deprive the courts of such jurisdiction, those provisions would be invalid as an unlawful suspension of habeas corpus.  Habeas relief is thus available in the present case to review claims by detainees that their force-feeding and the deprivation of their ability to pray communally during Ramadan deprive them of substantial rights.

(b)     Habeas relief is also available to challenge a quantum change in the level of a detainee's custody.  The detainees' force-feeding effects such a change, and thus is reviewable by habeas corpus, because force-fed detainees are transferred from communal living to isolation cells.

(c)     Habeas relief is also available to challenge force-feeding as a severe restraint on individual liberty, which surely occurs when a

17

detainee is shackled to a specially-made restraint chair and a tube is forced into his nostril, down his esophagus, and through to his stomach.

2.     The force-feeding of Guantánamo Bay detainees is unlawful for want of a reasonable relationship to any legitimate penological interest. Its purpose is to prolong the detainees' indefinite detention, which in itself is a human rights violation.  Force-feeding is an invasive procedure that is inhumane, degrading, and a violation of medical ethics—again, a human rights violation.  There cannot be a legitimate penological interest in committing one human rights violation (force-feeding) in order to perpetuate another human rights violation (indefinite detention).

3.     The deprivation of the detainees' ability to perform communal Ramadan prayers, which appellees have used to coerce some detainees to stop hunger-striking, violates the Religious Freedom Restoration Act (RFRA).  Given that the Supreme Court has recently determined that corporations are "persons" entitled to constitutional protection, the human beings detained at Guantánamo Bay should likewise be treated as "persons" entitled to the RFRA's protection.

18

# ARGUMENT

## I.    THE MILITARY COMMISSIONS ACT OF 2006 (MCA) DOES NOT BAR THE RELIEF SOUGHT HERE.

### A.    Because the MCA bars the courts from adjudicating non-habeas actions concerning conditions of confinement at Guantánamo Bay, habeas relief must be available to challenge conditions of confinement that deprive appellants of substantial rights.

Several judges of the district court, including Judge Kessler, have previously ruled that section 7 of the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600, to the extent it amends 28 U.S.C. § 2241, strips federal courts of jurisdiction as to any action by an enemy combatant against the United States relating to "conditions of confinement."    28 U.S.C. § 2241(e)(2) (2006); *see, e.g., Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 108-09 (D.D.C. 2010) (and cases cited therein).    In *Al-Adahi,* a 2009 action by Guantánamo Bay detainees seeking an injunction against the use of chair restraints in force-feeding, Judge Kessler concluded that "[t]he relief they seek clearly falls under § 2241(e)(2)." *Al-Adahi*, 596 F. Supp. 2d at 118.

In the recent Dhiab proceeding, Judge Kessler, citing her decision in *Al-Adahi*, concluded that "the Court feels just as constrained now, as it felt in 2009, to deny [Dhiab's] Application for lack of jurisdiction."  App. 120.

19

Judge Collyer likewise concluded that because of § 2241(e)(2), "[t]his Court is without jurisdiction here."  App. 148.

Appellants submit, however, that § 2241(e)(2) bars only *non-habeas* relief, and in doing so makes habeas relief available to appellants as their only recourse for challenging conditions of their confinement that deprive them of *substantial rights*.  The standard of review for the district court's jurisdictional ruling is *de novo*.  *Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations Auth.*, 283 F.3d 339, 341 (D.C. Cir. 2002).

Section 2241(e)(1) addresses *habeas* relief, stating:  "No court, justice, or judge shall have jurisdiction to hear or consider an application for a *writ of habeas corpus* filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."  28 U.S.C. § 2241(e)(1) (emphasis added).  The Supreme Court held in *Boumediene v. Bush*, 553 U.S. 723 (2008), that § 2241(e)(1) constitutes an unlawful suspension of the writ of habeas corpus.

In contrast, § 2241(e)(2) addresses *non-habeas* relief.  It provides that, with exceptions not applicable here, "no court, justice, or judge shall have jurisdiction to hear or consider any *other* action against the United

20

States or its agents relating to any aspect of the detention, transfer, treatment, trial, or *conditions of confinement* of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." 28 U.S.C. § 2241(e)(2) (emphasis added).

Section 2241(e)(2) thus precludes *Bivens* actions by appellants to challenge the conditions of their confinement. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 338 (1971). The consequence of this, according to reasoning in *Willis v. Ciccone*, 506 F.2d 1011 (8th Cir. 1974), is that *habeas relief* must be available to appellants to challenge conditions of their confinement that deprive them of *substantial rights*.

In *Willis*, a federal prisoner challenged the conditions of his confinement via a habeas petition. At that time, federal prisoners could not yet proceed under *Bivens*. Consequently, *Willis* held that habeas relief was available to them, in extraordinary cases, as their "only recourse" to challenge certain conditions of their confinement. *Willis*, 506 F.2d at 1014.

Since *Willis*, subsequent case law expanded the scope of *Bivens* to such an extent that *Bivens* actions have replaced habeas corpus as a

21

means for federal prisoners to challenge conditions of their confinement that deprive them of substantial rights. Consequently, *Willis* has lain fallow in recent years. *See Taylor v. Roal*, No. 10-cv-3588 (PJS/JJG), 2010 WL 4628634 (D. Minn. Nov. 5, 2010).

But the *reasoning* of *Willis* remains sound for the Guantánamo Bay detainees: If, by operation of § 2241(e)(2), they cannot proceed under *Bivens* to challenge conditions of confinement that deprive them of substantial rights, then a remedy must lie in habeas corpus, for that is their "only recourse." *Willis*, 506 F.2d at 1014. And, of course, the writ of habeas corpus remains available to the detainees because § 2241(e)(1) is invalid as an unlawful suspension of the writ. *Boumediene*, 553 U.S. at 792. To whatever extent § 2241(e)(2) might be construed as purporting to deprive the courts of jurisdiction to adjudicate a habeas petition challenging a condition of confinement that deprives a detainee of substantial rights, the provisions of § 2241(e)(2), like those of § 2241(e)(1), would be invalid as an unlawful suspension of habeas corpus.

In opposing appellants' emergency motion for an injunction pending appeal, appellees argued that habeas relief pursuant to the reasoning of *Willis* for a deprivation of substantial rights "would be antithetical to

22

Congress' intent in enacting § 2241(e)(2) . . . given Congress' intent to preclude detainees from bringing any habeas claims whatsoever." Opp. to Emergency Motion at 15-16. We readily concede that this was precisely Congress' intent: to deprive the detainees of habeas relief. But the Supreme Court held in *Boumediene* that such deprivation is invalid as an unlawful suspension of the writ of habeas corpus. *Boumediene*, 553 U.S. at 792. If, as appellees contend, § 2241(e)(2) must be construed as precluding injunctive relief that would be within the scope of habeas jurisdiction pursuant to the reasoning of *Willis*, then such preclusion is invalid under *Boumediene*. It, too, is an unlawful suspension of the writ.

In *Boumediene*, the Supreme Court expressly declined to address the question whether the detainees may proceed in habeas corpus to challenge the conditions of their confinement. *Boumediene*, 553 U.S. at 792 ("In view of our holding we need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement."); *see also Bell v. Wolfish*, 441 U.S. 520, 527 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) ("[W]e need not in this case explore the limits of habeas

corpus as an alternative remedy to a proper action under § 1983" to challenge prison conditions.). The present case squarely poses that question. We submit that, by depriving the courts of jurisdiction over *Bivens* actions, § 2241(e)(2) operates to vest the courts with habeas jurisdiction to adjudicate such challenges.

If the law were otherwise, Guantánamo Bay would fall between the cracks of American justice into a realm of lawlessness where the Executive Branch could abuse detainees with impunity, unchecked by the Judiciary. Once deemed lawfully detained, the detainees could be beaten, tortured, humiliated, prevented from observing the tenets of their faith, and deprived of medical care, all at the unfettered discretion of a single person—the President of the United States. Guantánamo Bay could become Abu Ghraib, and the courts would be powerless to stop it.

**B.    Habeas relief is also available to challenge appellants' force-feeding to the extent it involves a quantum change in their level of custody.**

As a separate and independent basis for seeking habeas relief, appellants assert habeas jurisdiction to review *a quantum change in the level of custody* in which they are being held. "If the prisoner is seeking what can fairly be described as a quantum change in the level of custody—

24

whether outright freedom, or freedom subject to the limited reporting and financial constraints of bond or parole or probation, or the run of the prison in contrast to the approximation to solitary confinement that is disciplinary segregation—then habeas corpus is his remedy." *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991); *accord Glaus v. Anderson*, 408 F.3d 382, 387-88 (7th Cir. 2005).

According to the protocols on force-feeding at Guantánamo Bay, force-fed detainees are "isolat[ed] . . . from each other" by transfer from communal living quarters to "single cell operations." *Medical Management of Detainees* at 14. Such a transfer from communal living to an isolation cell is indisputably "a quantum change in the level of custody." *Graham*, 922 F.2d at 381. It is no different than the quantum change that occurs where a prisoner is denied "the run of the prison in contrast to the approximation to solitary confinement that is disciplinary segregation." *Id.* For this reason, too, the detainees' force-feeding is reviewable via habeas corpus.

**C.    Habeas relief is also available to challenge force-feeding as a severe restraint on individual liberty.**

Yet another separate and independent basis for habeas relief against force-feeding is that it constitutes *a severe restraint on individual liberty*. *See Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara Cnty.*, 411 U.S. 345, 351 (1973) (A writ of habeas corpus is intended "as a remedy for severe restraints on individual liberty."). The Supreme Court has recognized a significant constitutionally-protected liberty interest in avoiding unwanted medical treatment. *E.g., Sell v. United States*, 539 U.S. 166, 177-78 (2003). Unwanted nasogastric tube feeding while shackled to a specially-made chair is surely within the scope of that constitutionally-protected liberty interest, and as a severe restraint on that interest is within the scope of the Great Writ.

A bodily invasion by force-feeding, where a tube is jammed into the detainee's nostril, down his esophagus, and through to his stomach, is an even more severe "quantum" change for the detainee than the change effected by the transfer from communal living quarters to an isolation cell. In this respect, the forced physical invasion of a bodily cavity goes far beyond, and differs fundamentally from, the mere fact of a law-of-war physical confinement. If it were not remediable in habeas corpus, then no

26

physical invasion—not even, for example, the forcible consumption of a toxic substance—would be judicially remediable.[1]

## II. THE GUANTÁNAMO BAY DETAINEES' FORCE-FEEDING IS NOT REASONABLY RELATED TO ANY LEGITIMATE PENOLOGICAL INTEREST.

### A. The standard for determining the validity of the protocols on force-feeding of Guantánamo Bay detainees is whether those protocols are reasonably related to legitimate penological interests.

"Prison walls do not form a barrier separating prison inmates from the protection of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Nevertheless, the constitutional rights of prisoners must sometimes yield to the practical needs of prison administration. *Id.* Accordingly, the Supreme Court has prescribed a test that strikes a balance between these two interests: "[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an

---

[1]  In finding no jurisdiction, Judge Collyer cited *Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012), stating "[t]his Court is bound by" *Al-Zahrani*.  App. 152-53.  This Court's decision in *Al-Zahrani*, however, is inapposite.  *Al-Zahrani* merely held that the courts lack *non-habeas* jurisdiction over actions seeking money damages relating to alleged mistreatment of Guantánamo Bay detainees.  *See Al-Zahrani,* 669 F.3d at 319.  *Al-Zahrani* did not address any of the theories of *habeas* jurisdiction asserted in the present appeal.

inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'" *Washington v. Harper*, 494 U.S. 210, 223 (1990) (quoting *Turner*, 482 U.S. at 89). A key consideration in determining the reasonableness of a prison regulation is whether there are "'ready alternatives'" to the regulation. *Id.* at 225 (quoting *Turner*, 482 U.S. at 90-91).

This standard has been applied to claims by Guantánamo Bay detainees. See *Al-Adahi*, 596 F. Supp. 2d at 120; *Hicks v. Bush*, 452 F. Supp. 2d 88, 101 (D.D.C. 2006). It makes no difference whether the purpose of the detention is intended to be punitive, because the "legitimate penological interests" test refers to the "interest in security and management" of prisons and jails. *Harper*, 494 U.S. at 247. Thus, even if a restriction accompanying pretrial detention does not amount to punishment, it is still unlawful if it is "not reasonably related to a legitimate [governmental] goal." *Bell*, 441 U.S. at 539.

Accordingly, the relevant question here is whether the protocols under which the detainees are being force-fed are reasonably related to legitimate penological interests. Given that review on this question arises within the context of an order denying a preliminary injunction, this Court

reviews the district court's weighing of pertinent preliminary injunction factors (*see infra,* at 45) for abuse of discretion, but reviews questions of law *de novo.  Sottera, Inc. v. Food & Drug Admin.,* 627 F.3d 891, 893 (D.C. Cir. 2010).

## B.    Appellants' detention has become indefinite.

The correct answer to the question posed here largely turns on the fact that, at this point, appellants have been detained at Guantánamo Bay without trial or military commission proceedings for up to *11 years.*  As a practical matter, appellants' detention has become *indefinite.*

Judge Kessler's order acknowledges this inescapable fact:  "Petitioner [Dhiab] has been detained at Guantánamo Bay for 11 years, despite having been cleared for release in 2009.  At no time during these 11 years has he had any hearing on the merits of his habeas petition, nor any military commission proceeding to determine the merits of his case.  Due to certain actions taken by Congress, Guantánamo Bay has not been closed, and Petitioner's detention *has, for all practical purposes, become indefinite.*"  App. 119-20 (emphasis added).

Appellees insisted in the district court that appellants "are not indefinitely detained," but "are detained pursuant to the [Authorization for

29

Use of Military Force], as informed by the laws of war." App. 84. This is Orwellian doublespeak. By any common-sense understanding, appellants' detention—now at 11 years and counting, long after they have been cleared for release—has become indefinite, and will remain indefinite until they are prosecuted or released.

## C.     There is no legitimate penological interest in force-feeding to prolong indefinite detention.

Under any standard of fairness, due process, or basic human rights, there cannot be a legitimate penological interest in detaining appellants indefinitely, or in forcibly administering nutrition so as to prolong that detention. The right to a speedy trial "has its roots at the very foundation of our English law heritage." *Klopfer v. N.C.*, 386 U.S. 213, 223 (1967). "The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution." *Id.* at 226. It appeared in the Magna Carta, which stated "we will not deny or defer to any man either justice or right." *Id.* at 223 (quoting the Magna Carta, c. 29, translated and quoted in Sir Edward Coke, The Second Part of the Institutes of the Laws of England 45 (Brooke

30

ed., 5th ed. 1797)). Indefinite detention is anathema to America's sense of fairness and due process.

Indefinite detention is known by health care professionals to cause substantial harm to its victims, including: severe and chronic anxiety and dread; pathological levels of stress that have damaging effects on the core physiologic functions of the immune, cardiovascular, and central nervous system; depression and suicide; post-traumatic stress disorder; dissociation, schizophrenia, and psychosis; and enduring personality changes. *See, e.g.,* Cara M. Cheyette, Physicians For Human Rights, Punishment Before Justice: Indefinite Detention in the US 2, 11-17 (Scott Allen & Vincent Iacopino eds., 2011).

International human rights law prohibits indefinite detention. The Universal Declaration of Human Rights states: "No one shall be subject to arbitrary arrest, detention or exile." Univ. Decl. of Human Rights art. 9 (1948). The International Covenant on Civil and Political Rights (ICCPR) states: "No one shall be subject to arbitrary arrest or detention." Int'l Covenant on Civ. & Pol. Rights art. 9, para. 1 (1976). "In its jurisprudence the United Nations Human Rights Committee, the body responsible for monitoring compliance by States party to the ICCPR, has made it clear

31

that detention which may be initially legal may become 'arbitrary' *if it is unduly prolonged . . . .*"  Alfred de Zayas, *Human rights and indefinite detention*, 87 Int'l Rev. of the Red Cross 15, 17-18 (2005) (emphasis added); *see also id.* at 19 ("[I]ndefinite detention may also entail a violation of other provisions of the Covenant, including Article 14, which guarantees a prompt trial before a competent and impartial tribunal, Article 7, which prohibits torture and inhuman or degrading treatment or punishment, and Article 10, which provides for humane treatment during detention.").

Appellants' indefinite detention, now exceeding a decade, has become unduly prolonged and thus arbitrary.  Given the harm that indefinite detention is known to cause its victims, and given its violation of international human rights law and the Anglo-American legal tradition, force-feeding to prolong such detention cannot serve any legitimate penological interest.  Indefinite detention is un-American.

America's religious leaders agree.  On June 25, 2013, Bishop Richard E. Pates, Chair of the Committee on International Justice and Peace for the United States Conference of Catholic Bishops, wrote to Secretary of Defense Chuck Hagel, saying:  "The indefinite detention of [Guantánamo Bay] detainees is not only injurious to those individuals, it also wounds the

moral reputation of our nation, compromises our commitment to the rule of law, and undermines our struggle against terrorism." Letter from Most Reverend Richard E. Pates, Bishop of Des Moines, to Honorable Chuck Hagel, Sec'y of Def. (June 25, 2013) at 1. Bishop Pates added: "Detainees retain basic human rights. The International Committee of the Red Cross has indicated its opposition to force-feeding . . . . Rather than resorting to such measures, our nation should first do everything it can to address the conditions of despair that have led to this protest." *Id.* at 2.

Similarly, Reverend Richard Killmer, executive director of the National Religious Campaign Against Torture, a multi-faith coalition of more than 320 religious organizations, said on June 26, 2013, that Guantánamo Bay "'remains an open wound, a symbol of the violation of our nation's deepest values.'" Dennis Sadowski, *Guantánamo Bay Prison poses moral dilemma for White House,* NATIONAL CATHOLIC REPORTER (June 29, 2013) at 1.

**D.    There is no legitimate penological interest in subjecting appellants to a painful invasive procedure that is inhumane, degrading, and a violation of medical ethics.**

The consensus of the United Nations Rapporteurs, the World Medical Association, the American Medical Association, bioethicists and human

33

rights organizations is that force-feeding of prisoners falls within the ambit of torture and constitutes cruel, inhuman, and degrading treatment or punishment. *E.g.,* Press Release, OHCHR, IACHR, UN Working Group on Arbitrary Detention, UN Rapporteur on Torture, UN Rapporteur on Human Rights and Counter-Terrorism, and UN Rapporteur on Health reiterate need to end the indefinite detention of individuals at Guantánamo Naval Base in light of current human rights crisis, U.N.H.R. Press Release (May 1, 2013), www.ohchr.org/en/newsevents/pages/isplaynews.aspx?newsid=13278&langl ("it is unjustifiable to engage in forced feeding of individuals contrary to their informed and voluntary refusal of such a measure"); World Medical Association, *WMA Declaration of Tokyo-Guidelines for Physicians Concerning Torture and other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment 2* (1975) ("Where a prisoner refuses nourishment and is considered by the physician as capable of forming an unimpaired and rational judgment concerning the consequences of such a voluntary refusal of nourishment, he or she shall not be fed artificially."); World Medical Association, *WMA Declaration of Malta on Hunger Strikers 6* (1991) ("Forcible feeding is never ethically acceptable. Even if intended to

34

benefit, feeding accompanied by threats, coercion, force or use of physical restraints is a form of inhuman and degrading treatment."); Letter from Jeremy A. Lazarus, M.D., President of Am. Med. Ass'n, to Honorable Chuck Hagel, Sec'y of Def. (Apr. 25, 2013) ("The forced feeding of detainees violates core ethical values of the medical profession."); *Guantánamo: hunger strikes and a doctor's duty*, 381 THE LANCET 1512, 1512 (2013) ("To force-feed infringes the principle of patient autonomy."); Int'l Comm. of the Red Cross, *Hunger strikes in prisons: the ICRC's position* (2013) ("The ICRC is opposed to forced feeding or forced treatment; it is essential that the detainees' choices be respected and their human dignity preserved."); United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment, Dec. 10, 1984, 1465 U.N.T.S. 85, 113 (defining torture as intentional infliction of "severe pain or suffering" for specified purposes or reasons); Geneva Convention Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 75 U.N.T.S. 135 (requiring that armed-conflict detainees in "all circumstances be treated humanely").

Force-feeding of hunger strikers is a violation of medical ethics. *See* App. 62 (declaration of Steven H. Miles, M.D., Professor of Medicine, University of Minnesota) (hereinafter Miles decl.); App. 67 (declaration of

Ret. Brig. Gen. Stephen N. Xenakis, M.D.) (hereinafter Xenakis decl.);

George J. Annas, Sondra S. Crosby & Leonard H. Glanz, *Guantánamo Bay: A Medical Ethics-free Zone?*, 369 NEW ENG. J. MED. 101,101 (2013) (hereinafter Annas et al.) ("That force-feeding of mentally competent hunger strikers violates basic medical ethics principles is not in serious dispute."); Michael L. Gross, *Force-Feeding, Autonomy, and the Public Interest*, NEW ENG. J. MED., 103,103 (2013) at 1 (hereinafter Gross) ("[M]ost bioethicists unequivocally oppose force-feeding."). "Physicians can no more ethically force-feed mentally competent hunger strikers than they can ethically conduct research on competent humans without informed consent." Annas et al., *supra* at 102. "Force-feeding a competent person is not the practice of medicine; it is aggravated assault." *Id.* Indeed, a recent article in the New England Journal of Medicine, describing Guantánamo Bay as having become "a medical ethics-free zone," urges the military physicians there to refuse to participate in force-feeding. *Id.* at 103.

Judge Kessler's order acknowledges "what appears to be a consensus that force-feeding of prisoners violates Article 7 of the International Covenant on Civil and Political Rights which prohibits torture or cruel, inhumane, and degrading treatment." App. 120. The order further

acknowledges "statements of the American Medical Association, the World Medical Association, the UN High Commissioner for Human Rights, [and] the UN Rapporteur on Human Rights and Counter-Terrorism condemning the force-feeding of detainees," as well as the American Medical Association's statement "that the force-feeding of detainees violates 'core ethical values of the medical profession.'" App. 121.

Forcible nasogastric tube feeding can be extremely painful. One Guantánamo Bay detainee recently said: "I will never forget the first time they passed the feeding tube up my nose. I can't describe how painful it is to be force-fed this way. As it was thrust in, it made me feel like throwing up. I wanted to vomit, but I couldn't. There was agony in my chest, throat and stomach. I had never experienced such pain before. I would not wish this cruel punishment on anyone." Samir Naji al Hasan Moqbel, *Gitmo Is Killing Me*, N.Y. TIMES, Apr. 14, 2013, at A19. Such pain should not be visited upon any prisoner if it has no legitimate penological justification, which is absent where the purpose of the force-feeding is to keep the prisoner alive for indefinite detention. As Judge Kessler observed, "it is perfectly clear from the statements of detainees, as well as from the

organizations just cited [in the Order], that force-feeding is a painful, humiliating, and degrading process." App. 121.

Contrary to Judge Collyer's assertion that appellants' "real complaint is that the United States is not allowing them to commit suicide by starvation," App. 153, appellants do not wish to die. But hunger striking is the only peaceful means available to them to protest their indefinite detention. *See* App. 65 (Miles decl.) ("[A] hunger strike is virtually the only means of meaningful expression of personal rights and public appeal open to the petitioners."); App. 68 (Xenakis decl.); Annas et al., *supra* at 102 ("Hunger striking is a peaceful political activity to protest terms of detention . . . . Hunger strikers are not attempting to commit suicide . . . [t]heir goal is not to die but to have perceived injustices addressed."); Gross, *supra* at 103 ("Hunger striking is a nonviolent act of political protest. It is not the expression of a wish to die . . . ."). The purpose of the detainees' force-feeding is to facilitate their indefinite detention not just by keeping them alive, but also by suppressing the only form of expression available to them to protest such detention. *See* App. 65 (Miles decl.)

Senator Dianne Feinstein, writing as Chair of the United States Senate Select Committee on Intelligence, recently voiced her objection to

force-feeding at Guantánamo Bay as being "out of step with international norms, medical ethics and practices of the U.S. Bureau of Prisons." Letter from Dianne Feinstein, Senator, to Honorable Chuck Hagel, Sec'y of Def. (June 19, 2013), http://www.feinstein.senate.gov/public/index.cfm/files/ serve/?file_id=17585d46-c235-4f32-b957-50648d4e6252.     She stated: "Hunger strikes are a long known form of non-violent protest aimed at bringing attention to a cause, rather than an attempt of suicide. I believe that the current approach raises very important ethical questions and complicates the difficult situation regarding the continued indefinite detention at Guantánamo." *Id.* at 3.

Appellees insisted in the district court that the detainees' force-feeding is necessary to prevent them from "lay[ing] waste to their bodies." App. 88. Indefinite detention, however, is laying waste to their souls.

**E.    The detainees' force-feeding cannot be justified by the interest in maintaining institutional security and discipline.**

The indefinite nature of appellants' detention distinguishes this case from a line of cases that have approved force-feeding of hunger-striking prisoners as reasonably related to the legitimate penological interest in maintaining prison security and discipline. *See, e.g., Freeman v. Berge*,

441 F.3d 543, 546-47 (7th Cir. 2006); *Matter of Bezio v. Dorsey*, 21 N.Y.3d 93, 103-04 (2013). In none of those cases was the prisoner detained indefinitely without trial. A previous challenge to the use of chair restraints in the force-feeding of Guantánamo Bay detainees was rejected, *see Al-Adahi,* 596 F. Supp. 2d 111, but that was more than four years ago, before the indefinite nature of detention at Guantánamo Bay had become evident.

There cannot be a legitimate penological interest in force-feeding the Guantánamo Bay detainees to prolong their indefinite detention. It facilitates the violation of a fundamental human right. The very notion of it is grotesque. Moreover, there are *ready alternatives* to such force-feeding: *promptly bring the detainees to trial or military commission proceedings*, the absence of which is the reason why they are hunger striking. Those alternatives make their force-feeding unreasonable. *Harper*, 494 U.S. at 223; *see* Gross, *supra* at 103 (urging, as an alternative to force-feeding, "accommodation" of Guantánamo Bay hunger strikers by, e.g., repatriating detainees who have been cleared for release and providing "customary legal proceedings" to other detainees).

### III. THE DEPRIVATION OF THE DETAINEES' ABILITY TO PERFORM COMMUNAL RAMADAN PRAYERS VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT (RFRA).

### A. The Guantánamo Bay detainees are "persons" protected by the RFRA.

The right of religious free exercise is a *substantial right*, enshrined in the First Amendment and further protected by the RFRA. Appellants contend that appellees, by depriving appellants of the right to perform communal *tarawih* prayers during Ramadan, have committed a deprivation of a substantial right within the scope of habeas jurisdiction. Again, given that review on this question arises within the context of an order denying a preliminary injunction, this Court reviews the district court's weighing of pertinent preliminary injunction factors (*see infra,* at 45) for abuse of discretion, but reviews questions of law *de novo. Sottera, Inc.,* 627 F.3d at 893.

The RFRA imposes a heightened standard of review where government substantially burdens "a person's" religious exercise. 42 U.S.C. § 2000bb-1 (2012); *see Makin v. Colorado Dep't of Corrections*, 183 F.3d 1205, 1213 (10th Cir. 1999) (denying Muslim prisoner the ability to observe the Ramadan fast infringes his right to freely exercise his religion). This Court previously held that Guantánamo Bay detainees are

41

not protected "person[s]" within the meaning of the RFRA, by analogy to constitutional law precedents establishing that non-resident aliens were not protected by the Fourth and Fifth Amendments. *Rasul v. Myers*, 563 F.3d 527, 532-33 (D.C. Cir. 2009).

But *Rasul v. Myers*, and the precedents upon which it relied, predated *Citizens United v. FEC*, 558 U.S. 310 (2010), which espoused a dramatically expansive view of the scope of constitutional protection for "persons"—in that case, for corporate personhood. In *Citizens United*, the Supreme Court expressly declined to decide the question of whether the First Amendment's protection for "persons" extends to "foreign individuals or associations." *Citizens United,* 558 U.S. at 362; *see generally Bluman v. FEC*, 800 F. Supp. 2d 281, 292 (D.D.C. 2011) (federal ban on political contributions by foreign nationals held constitutional, but "we do not decide whether Congress could prohibit foreign nationals from engaging in speech other than" such contributions). Thus, *Citizens United* revives the issue addressed in *Rasul v. Myers* and makes it an open question whether the RFRA's protection extends to non-resident aliens. This Court should resolve that question in appellants' favor.

42

In opposing appellants' emergency motion in this Court for an injunction pending appeal, appellees argued that appellants "as non-resident aliens" are not protected by the RFRA.  Opp. to Emergency Motion at 17.  Appellees did not, however, expressly spell out what they are actually contending:  that the Guantánamo Bay detainees are not "persons" entitled to the RFRA's protection.  *See* 42 U.S.C. § 2000bb-1 (imposing heightened standard of review where government substantially burdens "a person's" religious exercise).  Appellants ask this Court to consider the implications of appellees' unspoken claim in light of *Citizens United*.  It hardly advances domestic and international respect for American democracy when the Supreme Court treats corporations as "persons" but the President insists that human beings detained at Guantánamo Bay are not.

We submit that it is in the Nation's best interest to respect the religious beliefs of all persons it incarcerates—even, and perhaps especially, the Guantánamo Bay detainees.  The right of religious free exercise is a core American value, and to deprive the Guantánamo Bay detainees of that right does great damage to America in the eyes of the world in general and the world's Muslims in particular.

43

**B.    The Court should decide this issue because it is capable of repetition yet evading review.**

By the time this Court hears oral argument in this case, the month of Ramadan will have ended (on August 7, 2013), and appellees will likely contend that this issue is moot.  We submit, however, that the Court should nevertheless adjudicate this issue pursuant to the exception to the doctrine of mootness for cases that are *capable of repetition yet evading review.  Murphy v. Hunt*, 455 U.S. 478, 482 (1982).  This exception applies where "'(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'"  *Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)); *accord Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990).

Here, the challenged action—deprivation of the ability to perform communal prayer during the month of Ramadan—was of only 30 days' duration, which was too short to be fully litigated (that is, beyond the unsuccessful emergency motion for an injunction pending appeal) before those 30 days had lapsed.  Further, given the lengthy history of indefinite detention at Guantánamo Bay, we can reasonably expect that one or more of the appellants will still be detained eleven months from now at the start

44

of Ramadan in 2014 and at that time will again be threatened with deprivation of the ability to pray communally.  Absent review now, the issue will again evade review next year, due to the short duration of the deprivation.[2]

## IV.  APPELLANTS MEET THE CRITERIA FOR GRANTING A PRELIMINARY INJUNCTION.

In deciding whether to grant a preliminary injunction, the district court was required to consider four factors:  (1) whether petitioners made a strong showing that they are likely to prevail on the merits; (2) whether petitioners would be irreparably injured without such relief; (3) whether such relief would substantially harm respondents; and (4) where the public interest lies.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

---

[2]   Appellants asserted two other issues in the district court, which they do not assert on this appeal:  (1) that their force-feeding during the daylight hours of Ramadan would violate the RFRA, *see* App.19-20, and (2) that involuntary administration of the drug Reglan violates their right to refuse medical treatment, *see* App. 21-24.  Appellants now abandon the former argument because daytime force-feeding during Ramadan has evidently not occurred.  Appellants abandon the latter argument because, in opposition to the motion below, appellees submitted a declaration asserting that appellants have not been given Reglan unknowingly, *see* App. 105-06, and appellants lack any means to prove otherwise.

As demonstrated above, each of these criteria favors appellants. Given the absence of any legitimate penological interest in force-feeding to prolong appellants' indefinite detention, and given that depriving them of the ability to pray communally during Ramadan violates the RFRA, appellants are likely to prevail on the merits. Without an injunction, appellants will be irreparably injured by force-feeding that is painful, inhumane, degrading and medically unethical, as well as by the deprivation of the fundamental right to religious free exercise. In contrast, appellees can hardly be injured if detainees engage in communal prayer or refuse to eat. And surely the public interest cannot lie in continuing to pile human rights violations upon human rights violations at Guantánamo Bay. The Nation's best interest lies in its government honoring rules of medical ethics, respecting the right of religious free exercise, and ending indefinite detention at Guantánamo Bay by either prosecuting those detainees who should be prosecuted or releasing those who have been cleared for release.

## CONCLUSION

For the reasons discussed above, this Court should reverse the district court's order and direct the district court to grant the injunctive relief requested.

August 5, 2013               **JON B. EISENBERG**
                             1970 Broadway, Suite 1200
                             Oakland, CA 94612
                             (510) 452-2581


                             _____
                                /s/
                             Jon B. Eisenberg


August 5, 2013               **REPRIEVE**
                             Cori Crider
                             Clive Stafford Smith
                             Tara Murray
                             P.O. Box 72054
                             London EC3P 3BZ
                             United Kingdom
                             011 44 207 553 8140


                             _____
                                /s/
                                Cori Crider

47

# CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS (Fed. R. App. P. 32(a)(7)(C))

☒ 1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒  this brief contains 8,854 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    ☐  this brief uses monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

☒ 2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this brief has been prepared in a proportionally spaced typeface using MS-Word in 14-point Century Schoolbook font type, or

    ☐  this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

August 5, 2013 _____      s/ Jon B. Eisenberg _____
Date                          Jon B. Eisenberg

48

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Signature: s/ Jon B. Eisenberg