[Oral Argument Scheduled For October 18, 2013]

No. 13-5223 (consolidated with Nos. 13-5224 & 13-5225)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SHAKER ABDURRAHEEM AAMER, Detainee, Camp Delta, and SAEED
AHMED SIDDIQUE, next friend of Shaker Abdurraheem Aamer,

Appellants,

v.

BARACK OBAMA, President of the United States of America; CHUCK HAGEL,
Secretary, United States Department of Defense; RICHARD W. BUTLER, Rear
Admiral – Commander, Joint Task Force – GTMO; DONNIE THOMAS, Army
Colonel – Commander, Joint Detention Group, JTF-GTMO,

Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEES**

STUART F. DELERY
 Assistant Attorney General

DOUGLAS N. LETTER
 (202) 514-3602
MATTHEW M. COLLETTE
 (202) 514-4214
DANIEL J. LENERZ
 (202) 514-0718
 Attorneys, Appellate Staff, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

A.  <u>Parties and Amici</u>: In addition to the parties, intervenors and amici listed in petitioners' brief, the following are also appellees: Chuck Hagel, Secretary, United States Department of Defense; Donnie Thomas, Army Colonel – Commander, Joint Detention Group, Joint Task Force-Guantanamo; Richard W. Butler, Rear Admiral – Commander, Joint Task Force-Guantanamo.

B.  <u>Rulings Under Review</u>: The rulings at issue appear in petitioners' brief.

C.  <u>Related Cases</u>: The related cases are listed in petitioners' brief. By order dated July 22, 2013, this Court consolidated case No. 13-5223, the appeal filed by petitioner Shaker Aamer, with case No. 13-5224, the appeal filed by petitioner Nabil Hadjarab, and case No. 13-5225, the appeal filed by petitioner Ahmed Belbacha.

  <u>/s/ Daniel J. Lenerz</u>
  DANIEL J. LENERZ
   (202) 514-0718
  *Attorney, Appellate Staff*
  *Civil Division, Room 7242*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530-0001*

September 4, 2013

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION .................................................................1

STATEMENT OF THE ISSUES..................................................................2

STATUTES AND REGULATIONS .............................................................2

STATEMENT OF THE CASE .....................................................................2

STATEMENT OF THE FACTS ...................................................................3

A.     Factual Background.........................................................................3

B.     Procedural History...........................................................................7

SUMMARY OF ARGUMENT...................................................................11

STANDARD OF REVIEW .......................................................................15

ARGUMENT          .......................................................................................15

A.     Legal Standard................................................................................15

B.     Petitioners Cannot Demonstrate a Likelihood of Success
       on the Merits of Their Habeas Challenge to Their Medical
       Treatment and Conditions of Confinement....................................16

       a.     The Courts Lack Jurisdiction Over Petitioners'
              Conditions of Confinement and Treatment Claims..................16

       b.     Events That Occurred During the Pendency of
              This Appeal Have Rendered Petitioner Hadjarab's
              Claims Moot ...........................................................................32

       c.     Even if the Courts Had Jurisdiction Over Petitioners'
              Preliminary Injunction Motion, Petitioners Have Not
              Established a Likelihood of Success on the Merits of
              Their Underlying Claims...........................................................33

C.      Petitioners Have Not Demonstrated Irreparable Harm........................................44

D.      The Balance of Harms and the Public Interest Weigh
        Decisively Against the Relief Petitioners Seek .......................................................45

CONCLUSION    ..........................................................................................................47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page**

*Al Shurfa v. Obama*,
  2009 WL 1451500 (D.D.C. May 21, 2009) .....................................................................18

*Al-Adahi v. Obama*,
  596 F. Supp. 2d 111 (D.D.C. 2009) ........................................................................... 6, 18

*Al-Ghizzawi v. Bush*,
  2008 WL 948337 (D.D.C. April 8, 2008) ...................................................................18

*\*Al-Zahrani v. Rodriguez*,
  669 F.3d 315 (D.C. Cir. 2012) ......................................................................... 9, 16, 18, 35

*Apotex, Inc. v. FDA*,
  449 F.3d 1249 (D.C. Cir. 2006) ............................................................................. 15, 16

*Application of Hodge*,
  262 F.2d 778 (9th Cir. 1958) ....................................................................................24

*Badea v. Cox*,
  931 F.2d 573 (9th Cir. 1991) ....................................................................................20

*Bensenville v. FAA*,
  457 F.3d 52 (D.C. Cir. 2006) ....................................................................................43

*\*Bezio v. Dorsey*,
  989 N.E.2d 942 (N.Y. 2013) .............................................................................. 34, 45

*\*Boumediene v. Bush*,
  553 U.S. 723 (2008) .............................................................................7, 17, 21, 24, 25

*Brown v. Plaut,*
    131 F.3d 163 (D.C. Cir. 1997) ......................................................19

*Bunn v. Conley,*
    309 F.3d 1002 (7th Cir. 2002) ....................................................28

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ..........................................................42, 43

*Davis v. Pension Benefit Guarantee Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ...............................................15, 16

*Del Monte Fresh Produce Co. v. United States,*
    570 F.3d 316 (D.C. Cir. 2009) ...................................................42

*Dhiab v. Obama,*
    2013 WL 3388650 (D.D.C. July 8, 2013) ....................................18

*Doe v. Pennsylvania Board of Probation & Parole,*
    513 F.3d 95 (3d Cir. 2008) .......................................................20

*Dorfmann v. Boozer,*
    414 F.2d 1168 (D.C. Cir. 1969) .................................................15

*Freeman v. Berge,*
    441 F.3d 543 (7th Cir. 2006) ..................................35, 39, 42, 44, 45

*Garcia v. Steele,*
    193 F.2d 276 (8th Cir. 1951) ....................................................25

*Garza v. Carlson,*
    877 F.2d 14 (8th Cir. 1989) .................................................35, 44

*Glaus v. Anderson,*
    408 F.3d 382 (7th Cir. 2005) ....................................................20

*Gonzalez-Fuentes v. Molina,*
    607 F.3d 864 n.7 (1st Cir. 2010) ..................................................28

*Graham v. Broglin,*
922 F.2d 379, 380-81 (7th Cir. 1991)................................... 26, 27, 28, 29

*\*Gul v. Obama,*
    652 F.3d 12 (D.C. Cir. 2011)................................................ 13, 32

*Hensley v. Municipal Court, San Jose Milpitas Judicial District, Santa Clara County,*
    411 U.S. 345 (1973) ....................................................... 30, 31

*Hutcherson v. Riley,*
    468 F.3d 750 (11th Cir. 2006) ...............................................20

*\*In re Grand Jury Subpoena,*
    150 F.3d 170 (2d Cir. 1998)................................................ 34, 36

*In re Guantanamo Bay Detainee Litig.,*
    577 F. Supp. 2d 312 (D.D.C. 2008) ...........................................18

*\*In re Soliman,*
    134 F. Supp. 2d 1238 (N.D. Ala. 2001) .................................... 13, 36

*Inmates of Allegheny County Jail v. Pierce,*
    612 F.2d 754 (3d Cir. 1979).................................................33-34

*INS v. St. Cyr,*
    533 U.S. 289 (2001) ........................................................19

*Justices of Boston Municipal Court v. Lydon,*
    466 U.S. 294 (1984) ........................................................30

*Khadr v. Bush,*
    587 F. Supp. 2d 225 (D.D.C. 2008) ....................................18, 27, 28

*Kiyemba v. Obama,*
  555 F.3d 1022 (D.C. Cir. 2009) ..................................................................33

*\*Kiyemba v. Obama,*
  561 F.3d 509 (D.C. Cir. 2009) ...................................................21, 26, 30

*Kruger v. Erickson,*
  77 F.3d 1071 (8th Cir. 1996) ...................................................................22

*Long v. Parker,*
  390 F.2d 816 (3d Cir. 1968) ....................................................................24

*Mansfield, Coldwater & Lake Michigan Railway Co. v. Swan,*
  111 U.S. 379 (1884) .................................................................................16

*Martinez v. Mancusi,*
  443 F.2d 921 (2d Cir. 1970) ....................................................................34

*Martinez v. Turner,*
  977 F.2d 421 (8th Cir. 1992) ...................................................................39

*\*Miller v. Overholser,*
  206 F.2d 415 (D.C. Cir. 1953) ...................................................12, 20, 25

*O.K. v. Bush,*
  344 F. Supp. 2d 44 (D.D.C. 2004) ...........................................................39

*Overton v. Bazzetta,*
  539 U.S. 126 (2003) .................................................................................33

*Petit v. U.S. Department of Education,*
  675 F.3d 769 (D.C. Cir. 2012) .................................................................31

*Pischke v. Litscher,*
  178 F.3d 497 (7th Cir. 1999) ...................................................................20

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) .................................................................................19

*Rael v. Williams,*
    223 F.3d 1153 (10th Cir. 2000) .............................................................20

*\*Rasul v. Myers,*
    563 F.3d 527 (D.C. Cir. 2009).......................................................... 14, 42

*Riggins v. Nevada,*
    504 U.S. 127 (1992) .................................................................................29

*Roberts v. Pegelow,*
    313 F.2d 548 (4th Cir. 1963) ..................................................................24

*Sandin v. Conner,*
    515 U.S. 472 (1995) .................................................................................28

*Sell v. United States,*
    539 U.S. 166, 178 (2003) ........................................................................ 29

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011)................................................................16

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998).....................................................................................16

*Sylvester v. Hanks,*
    140 F.3d 713 (7th Cir. 1998) ..................................................................29

*Taylor v. Roal,*
    2010 WL 4628634, ............................................................................ 22, 23

*Tumani v. Obama,*
    598 F. Supp. 2d 67 (D.D.C. 2009) .........................................................18

*Turner v. Safley*,
    482 U.S. 78 (1987).................................................................. 33, 37

*United States ex rel. Knight v. Ragen*,
    337 F.2d 425 (7th Cir. 1964) ..............................................24

*Von Holden v. Chapman*,
    450 N.Y.S.2d 623 (N.Y. App. Div. 1982) .......................30

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ........................................................ 29, 30

*Wilkinson v. Dotson*,
    544 U.S. 74 (2005)........................................................... 19, 28

*Willis v. Ciccone*,
    506 F.2d 1011 (8th Cir. 1974) ..................................... 12, 21, 22, 23

*Wilson v. Seiter*,
    501 U.S. 294 (1991) ............................................................39

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)............................................................ 15, 39

*Zivotofsky v. Secretary of State*,
    No. 07-5347, __ F.3d__, 2013 WL 3799663 (D.C. Cir. July 23, 2013) ............... 31, 32

**Statutes:**

28 U.S.C. § 1292(a)(1) .........................................................1

28 U.S.C. § 2241 ...................................................................20

28 U.S.C. § 2241(e)........................................................11, 17, 21

28 U.S.C. § 2241(e)(1) ...........................................................21, 24, 25

*28 U.S.C. § 2241(e)(2) ............................ 2, 8, 9, 11, 12, 17, 18, 19, 21, 23, 24, 25, 26, 31

42 U.S.C. § 2000bb, et seq. .............................................................3

42 U.S.C. § 2000bb(b)(1) ...............................................................43

**Rules:**

Fed. R. App. P. 4(1)(B) ....................................................................1

**Legislative Materials:**

152 Cong. Rec. S10375 (daily ed. Sept 28, 2006)......................... 17, 23

152 Cong. Rec. S10367 (daily ed. Sept. 28, 2006) ....................... 17, 23

152 Cong. Rec. S10268 (daily ed. Sept. 28, 2006) ...........................18

## GLOSSARY

App.                    Appendix

ICTY                    International Criminal Tribunal for the Former Yugoslavia

JTF-GTMO                Joint Task Force-Guantanamo

MCA                     Military Commissions Act of 2006

Op.                     Opinion

Pet. Br.                Petitioners' Brief

RFRA                    Religious Freedom Restoration Act

SMO Decl.               Declaration of JTF-GTMO Senior Medical Officer

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 13-5223
(consolidated with Nos. 13-5224 & 13-5225)

————————————

SHAKER ABDURRAHEEM AAMER, Detainee, Camp Delta, and SAEED
AHMED SIDDIQUE, next friend of Shaker Abdurraheem Aamer,

Appellants,

v.

BARACK OBAMA, President of the United States of America; CHUCK HAGEL,
Secretary, United States Department of Defense; RICHARD W. BUTLER, Rear
Admiral – Commander, Joint Task Force – GTMO; DONNIE THOMAS, Army
Colonel – Commander, Joint Detention Group, JTF-GTMO,

Appellees.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

BRIEF FOR APPELLEES

————————————

## STATEMENT OF JURISDICTION

On July 16, 2013, the district court denied identical motions for a preliminary

injunction filed by habeas petitioners Shaker Aamer (ISN 239), Nabil Hadjarab (ISN

238), and Ahmed Belbacha (ISN 290). *See* Appendix (App.) 142-157. Petitioners filed

timely notices of appeal on July 18, 2013. *See* 28 U.S.C. § 1292(a)(1); Fed. R. App. P.

4(1)(B). As discussed below, the district court correctly concluded that the courts lack

jurisdiction over petitioners' preliminary injunction motions.

## STATEMENT OF THE ISSUES

At the time they sought the injunctive relief at issue, petitioners were detainees at Guantanamo Bay who had been designated as hunger strikers; two of the petitioners had been approved to receive enteral feeding, when necessary. Petitioners moved for a preliminary injunction that would prevent respondents from feeding petitioners involuntarily and would have the effect of allowing petitioners to starve themselves to death. The issues presented on appeal are:

1. Whether the district court correctly concluded that 28 U.S.C. § 2241(e)(2) withdraws the courts' jurisdiction over petitioners' challenge to their treatment and conditions of confinement.

2. Whether the district court appropriately denied petitioners' requested injunction because all four preliminary injunction factors weigh against providing the relief petitioners seek.

## STATUTES AND REGULATIONS

The pertinent statutes are set forth in petitioners' brief.

## STATEMENT OF THE CASE

At the time they sought the injunctive relief at issue in this case, petitioners were detainees at Guantanamo Bay who had been designated by the Joint Task Force-Guantanamo (JTF-GTMO) as hunger strikers, and two of the petitioners—Belbacha and Hadjarab—had been approved to receive enteral feeding. *See* Declaration of JTF-GTMO Senior Medical Officer (SMO Decl.) ¶¶ 21-23, Appendix (App.) 96-97. On

2

June 30, 2013, petitioners moved the district court for a preliminary injunction prohibiting respondents from feeding them involuntarily. App. 1-30. On July 15, while their preliminary injunction motion was pending, petitioners submitted what they characterized as a "Second Supplemental Memorandum in Support of Application for Preliminary Injunction Against Force-Feeding," App. 137-141, in which they for the first time asserted that respondents were violating the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb, *et seq.*, by preventing petitioners from performing communal *tarawih* prayers—extra prayers that are traditionally performed after each day's final evening prayer—during Ramadan. The district court denied petitioners' requested injunction on July 16. App. 142-157. Petitioners each filed a notice of appeal from the district court's order, which were consolidated.

## STATEMENT OF THE FACTS

### A. Factual Background

Beginning in February 2013, a number of Guantanamo Bay detainees began participating in a hunger strike to protest their continued detention. As of September 3, 2013, JTF-GTMO has designated 34 detainees as hunger strikers, of which 31 have been further approved to receive enteral feeding by way of a nasogastric tube, when necessary. At the time they filed the motion for a preliminary injunction at issue in this appeal, petitioners were among those detainees designated by JTF-GTMO as hunger strikers, and two of the petitioners—Belbacha and Hadjarab—had been

3

approved to receive enteral feeding. *See* SMO Decl. ¶¶ 21-23, App. 96-97. While this appeal was pending, on August 22, 2013, petitioner Aamer's designation as a hunger striker was removed. And on August 29, 2013, the Department of Defense announced that petitioner Hadjarab had been transferred to the custody of the Government of Algeria. *See* http://www.defense.gov/releases/ release.aspx?releaseid=16235; *Hadjarab v. Obama*, 05-CV-1504 (RMC) (Order) (Dkt. No. 314) (August 29, 2013) (dismissing Hadjarab's habeas case as moot).

It is Department of Defense policy to support the preservation of detainees' life and health by appropriate clinical means and standard medical intervention, in a humane manner, and in accordance with all applicable standards. *See id.* ¶ 9, App. 93. To that end, JTF-GTMO has established clinically appropriate procedures to address the medical care and treatment of hunger striking detainees. *See id.* ¶¶ 9-19, App. 93-96. JTF-GTMO's hunger strike protocol follows the Federal Bureau of Prisons' model and guidelines for managing hunger strikers. *Id.* ¶ 9, App. 93.

The Joint Medical Group at JTF-GTMO designates detainees as hunger strikers based on various criteria, including the detainee's intent and behavior and objective factors such as a detainee missing nine consecutive meals or weight loss to a level less than 85% of the detainee's ideal body weight. *Id.* ¶ 10, App. 93. Once a detainee is designated as a hunger striker, the medical staff carefully monitors his health by means of physical and psychological examinations. *Id.* Further, JTF-GTMO medical staff provides extensive counseling and detailed warnings to detainees about

4

the consequences of refusing to eat or drink. *Id.* Medical personnel explain that their role is to preserve and promote the detainees' life and health, and urge the detainees to accept enough nutrition voluntarily to increase their weight and improve their health. *Id.*

If JTF-GTMO medical staff determines that the detainee's life or health could be threatened by his refusal to voluntarily consume adequate food or nutrients, the medical staff obtains authorization from the JTF-GTMO Commander to feed the detainee enterally. *Id.* ¶ 11, App. 94. The decision to designate a detainee for enteral feeding does not mean that a detainee must receive all nutrition through a nasogastric tube. Prior to every feeding, the detainee is offered the opportunity to eat a standard meal or consume a liquid nutritional supplement orally, instead of being enterally fed. *Id.* Medical personnel counsel the detainee on his options, and provide an explanation of how and why enteral feeding will be implemented to preserve his health and life. *Id.*

Enteral feeding is administered in a humane manner through a nasogastric tube, and only when medically necessary to preserve the detainee's health or life. *Id.* ¶ 12, App. 94. The nasogastric tubes are inserted only by physicians or credentialed registered nurses who have received appropriate training. *Id.* ¶¶ 12, 14, App. 94. When inserting a nasogastric tube, a lubricant or (if requested by the detainee) olive oil is applied to the sterile tube. *Id.* ¶ 13, App. 94. A topical anesthetic such as lidocaine is offered to minimize any pain, but the detainee may decline it. *Id.* Anesthetic throat lozenges are also available to the detainees if they so choose. *Id.* ¶ 15, App. 94-95. The

nasogastric tube is inserted down into the stomach slowly and directly, and removed carefully. *Id.* The process is never undertaken in a fashion intentionally designed to inflict pain or harm on the detainee. *Id.*

Each detainee receives an appropriate quantity and type of nutritional formula tailored to the detainee's specific needs. *Id.* ¶ 15, App. 94-95. To ensure the safety of the guard staff, medical staff, and the detainee, enteral feedings are conducted in a restraint chair. *Id.* ¶¶ 17-18, App. 95; *see also Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 115-16 (D.D.C. 2009) (discussing circumstances that led to restraint chair being used for enteral feedings). The process usually lasts 30 to 40 minutes, and a detainee is kept in the chair only for the time required to administer the nutritional formula and an additional observation period to ensure digestion. *Id.* ¶¶ 15, 18, App. 94-95. JTF-GTMO medical staff carefully monitors the feeding process, adjusting the rate and amount of nutrients and fluids given if there are indications of discomfort to the detainee. *Id.* Detainees are offered pain relievers, such as ibuprofen, if they indicate discomfort from the procedures. The detainee's comfort and safety is a priority for the medical staff. *Id.*

All detainees who are enterally fed are assessed daily by medical professionals and receive regular and periodic reviews by a physician to ensure the feeding process is being administered properly. *Id.* ¶ 16, App. 95. The detainee's health is closely monitored to ensure he receives appropriate nutrition and to assess the need for any modifications. *Id.*

## B. Procedural History

Petitioners have each challenged the legality of their detention by bringing habeas actions in accordance with *Boumediene v. Bush*, 553 U.S. 723 (2008).[1] In those actions, on June 30, 2013, petitioners moved the district court for a preliminary injunction prohibiting respondents from feeding them involuntarily. App. 1-30. Petitioners' motion did not raise any claims with regard to their ability to perform communal *tarawih* prayers during Ramadan. *See generally id.* Instead, on July 15, while their preliminary injunction motion was pending (and after the government had filed its response to the motion), petitioners submitted what they characterized as a "Second Supplemental Memorandum in Support of Application for Preliminary Injunction Against Force-Feeding, " App. 137-141, in which they asserted for the first time that respondents were violating the Religious Freedom Restoration Act (RFRA) by preventing petitioners from performing communal *tarawih* prayers during Ramadan. Petitioners submitted no evidence to support this claim, instead relying on citations to two newspaper articles which stated that respondents were moving

---

[1] Petitioner Belbacha has stayed his habeas case. *See Belbacha v. Obama*, 05-CV-2349 (RMC) (Minute Order) (Sept. 14, 2012) (granting Belbacha's motion to stay). Petitioner Aamer's habeas case was stayed with his consent for three years (from December 2008 to December 2011), but is now moving forward with discovery. *See Aamer v. Obama*, 04-CV-2215 (RMC) (Dkt. No. 198) (joint motion to lift stay). Petitioner Hadjarab's habeas case was dismissed as moot on August 29, 2013, after he was transferred to the custody of the Government of Algeria. *See Hadjarab v. Obama*, 05-CV-1504 (RMC) (Order) (August 29, 2013).

compliant detainees who were not participating in the hunger strike into communal living conditions. *Id.* at 2-3.[2]

The district court denied petitioners' requested injunction on July 16. Opinion (Op.), App. 142-157. The district court based its ruling on two independent legal grounds. First, the court concluded that it lacked subject matter jurisdiction over petitioners' claims because "Congress has explicitly removed all aspects of 'treatment' and 'conditions of confinement' at Guantanamo Bay from the jurisdiction of federal courts." Op. at 7, App. 148 (citing 28 U.S.C. § 2241(e)(2)). The court explained that its holding was consistent with the opinions of "[n]umerous judges in this District [who] have determined that § 2241(e)(2) precludes jurisdiction over detainee treatment cases." Op. at 8, App. 149 (citing cases).

The district court rejected petitioners' argument that § 2241(e)(2) does not apply because petitioners are not challenging the conditions of their confinement. The court found that petitioners were, in fact, challenging the conditions of their confinement because the relief they seek "can have no impact on the length of their detention as authorized by law and does not concern the duration of their confinement." *Id.* at 9, App. 150.

The district court also rejected petitioners' argument that, if § 2241(e)(2) applies, it constitutes an unlawful suspension of the writ of habeas corpus. The court

---

[2] The district court entered its order denying petitioners' requested injunction before the government's response to petitioners' Second Supplemental Memorandum was due.

found that argument precluded by *Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012), in which this Court "held that § 2241(e)(2) is a valid exercise of congressional power and that it precludes federal court jurisdiction over a case asserting Fifth and Eighth Amendment violations arising from alleged physical, psychological, and religious abuse; inadequate medical treatment; and withholding of medication." Op. at 11, App. 152. "While the Suspension Clause guarantees a detainee a meaningful opportunity to show that he is being held pursuant to an erroneous application or interpretation of law," the district court determined that the Clause "extends no guarantee of the right to challenge treatment and conditions of confinement, such as enteral feeding." *Id.* The district court thus concluded that it lacked jurisdiction over petitioners' motion. *Id.* at 12, App. 153.

As a second, separate ground for denying petitioners' motion, the district court concluded that, even if it had jurisdiction, it would deny the motion due to petitioners' failure to establish a likelihood of success on the merits and because the public interest and balance of harms weigh in respondents' favor. *Id.* According to the district court, "[a]lthough framed as a motion to stop feeding via nasogastric tube, Petitioners' real complaint is that the United States is not allowing them to commit suicide by starvation." *Id.* Given the substance of petitioners' complaint, the district court found that "[e]ven if Petitioners are accorded . . . constitutional rights, they have not carried their burden of showing that the policy of feeding enterally hunger-striking detainees is unreasonable." *Id.* at 12-13, App. 153-54. As recognized by numerous

9

courts, the government has an "affirmative duty to prevent suicide and to provide life-saving nutritional and medical care to persons in custody"; it cannot simply "'allow' any person held in custody to starve himself to death." *Id.* at 13, App. 154. Were an injunction granted, petitioners "would be permitted to refuse food and endanger their lives and health, possibly to the point of death. This would be contrary to the Government's duty to provide life-saving medical care to persons in custody and would undermine the security and safety of the Guantanamo facility and the detainees housed there." *Id.* at 14, App. 155. For these reasons, the court found, petitioners had not established a likelihood of success on the merits, and the balance of harms weighed against petitioners' requested injunction. *Id.* The district court's opinion did not directly address petitioners' assertions with regard to communal *tarawih* prayers.

On July 18, 2013, petitioners moved the district court for an emergency injunction pending appeal. App. 158-170. In that emergency motion, petitioners sought an injunction "prohibiting respondents from depriving petitioners of their right to perform nightly communal Ramadan prayers unless they stop hunger-striking." *Id.* at 11, App. 168. As with their Second Supplemental Memorandum, petitioners submitted no evidence in support of this motion, once again citing the two newspaper articles stating that respondents were moving compliant detainees who were not participating in the hunger strike into communal living conditions. *Id.* at 3, App. 160. The district court denied petitioners' emergency motion (without requiring

10

an opposition from respondents) for the same reasons it had denied petitioners'
motion for a preliminary injunction. *See* Order, App. 171-73.

 On July 22, 2013, petitioners renewed their emergency motion in this Court,
seeking the same relief. The Court denied petitioners' motion on July 29, but ordered
that briefing be expedited. *See* Order (Doc. No. 1448828).

On August 29, the Department of Defense announced that petitioner Hadjarab
had been transferred from Guantanamo Bay to the custody of the Government of
Algeria. *See* http://www.defense.gov/releases/release.aspx?releaseid=16235. That
day, the district court dismissed Hadjarab's habeas case as moot. *Hadjarab v. Obama*,
05-CV-1504 (RMC) (Order, Dkt. No. 314) (August 29, 2013).

## SUMMARY OF ARGUMENT

The district court properly concluded that it lacked jurisdiction to address
petitioners' habeas challenge to their conditions of confinement and treatment as
detainees at Guantanamo Bay. In the Military Commissions Act of 2006, 28 U.S.C.
§ 2241(e), Congress specifically withdrew from the federal courts jurisdiction to
adjudicate conditions of confinement and treatment claims by detainees. *See* 28 U.S.C.
§ 2241(e)(2) ("[N]o court, justice, or judge shall have jurisdiction to hear or consider
any other action against the United States or its agents relating to any aspect of the . . .
*treatment* . . . or *conditions of confinement*" of detainees at Guantanamo Bay) (emphasis
added). While petitioners assert that § 2241(e) bars only non-habeas relief, the law is
clear that habeas is not an appropriate vehicle by which to adjudicate conditions of

confinement and treatment claims. Indeed, this Court has recognized that "the courts will not interfere with discipline or treatment in a place of legal confinement, and so habeas corpus is not an available remedy." *Miller v. Overholser*, 206 F.2d 415, 419-20 (D.C. Cir. 1953). As such, petitioners cannot challenge their treatment and conditions of confinement by way of a proper habeas petition, and thus § 2241(e)(2) bars petitioners' claims.

Petitioners' other attempts to establish the courts' jurisdiction over their habeas challenge to their treatment and conditions of confinement are equally unavailing. For example, petitioners rely on a single Eighth Circuit case, *Willis v. Ciccone*, 506 F.2d 1011 (8th Cir. 1974), for the proposition that they may challenge their treatment and conditions of confinement by way of a habeas petition because a *Bivens* remedy was made unavailable to them by § 2241(e)(2). But *Willis* is no longer good law, even in the Eighth Circuit, and following it here would both be inconsistent with the prevailing rule that habeas may not be used to challenge a prisoner's conditions of confinement and would be antithetical to Congress' intent in enacting § 2241(e)(2). Nor does § 2241(e)(2) constitute an unlawful suspension of the writ when construed as precluding petitioners' requested injunctive relief. Indeed, courts have long understood that habeas is not a proper vehicle for prisoners to challenge the conditions of their confinement.

Petitioners also cannot establish the courts' jurisdiction over their preliminary injunction motion on the basis that it implicates "a quantum change in the level of

custody" in which petitioners are being held or by claiming that involuntary feeding "constitutes a severe restraint on individual liberty." Petitioners are not seeking a quantum change in the level of their custody; they are seeking an order requiring the government to cease feeding them involuntarily. And there is no special category of habeas jurisdiction for challenges involving alleged "restraints on individual liberty."

This court also does not have jurisdiction over the appeal by petitioner Hadjarab because events that occurred during the pendency of this appeal have rendered Hadjarab's claims moot. Petitioner Hadjarab has been transferred from Guantanamo Bay to the custody of the Government of Algeria, rendering his underlying habeas suit, and the claims he raises on appeal regarding his treatment at Guantanamo Bay, moot. *See Gul v. Obama*, 652 F.3d 12 (D.C. Cir. 2011).

The district court also properly concluded that, even if it had jurisdiction, petitioners would not be entitled to a preliminary injunction in this case. All four preliminary injunction factors weigh against granting the relief petitioners seek. On the merits of petitioners' enteral feeding claim, courts have repeatedly recognized the government's legitimate interest in providing life-saving nutritional and medical care in order to preserve the life and prevent suicidal acts of individuals in its care and custody. *See generally In re Soliman*, 134 F. Supp. 2d 1238, 1255-56 (N.D. Ala. 2001) (noting that that "Federal Courts generally have approved of force-feeding hunger striking inmates . . . State courts also have upheld the right to force-feed hunger-striking prisoners"), *vacated as moot*, 296 F.3d 1237 (11th Cir. 2002). While petitioners

13

attempt to distinguish their case as one involving "indefinite detention," and claim that enteral feeding "is inhumane, degrading and a violation of medical ethics" and "can be extremely painful," these assertions in no way undercut respondents' legitimate interests in preserving petitioners' lives, safeguarding the health of all detainees, and maintaining order and safety at Guantanamo Bay.

With regard to the merits of petitioners' RFRA claim, that claim is moot because petitioners do not have a reasonable expectation that they will again be subject to the same treatment next Ramadan. Moreover, even if that claim were not moot, petitioners cannot succeed on the merits of their RFRA claim because, as non-resident aliens, they do not fall within the category of "persons" protected by RFRA. *See Rasul v. Myers*, 563 F.3d 527, 532-33 (D.C. Cir. 2009).

The other preliminary injunction factors also weigh against granting petitioners' requested injunction. Petitioners have not demonstrated irreparable harm; to the contrary, the enteral feeding to which petitioners object prevents petitioners from starving themselves to death, provides them with adequate nutrition, and keeps them in good health. The balance of harms and public interest also weigh against allowing petitioners to refuse food, even to the point of death. Instead, the balance of harms and public interest point in favor of preserving the health and safety of persons held in government custody, for whose welfare the public has assumed responsibility, and in avoiding the threat to good order, and to the safety of detainees and military personnel alike, should hunger striking detainees be allowed to perish.

14

## STANDARD OF REVIEW

The district court's weighing of the four preliminary injunction factors and its ultimate decision to grant or deny injunctive relief is reviewed for an abuse of discretion. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). The district court's legal conclusions are reviewed de novo. *Id.*

## ARGUMENT

### A. Legal Standard

A preliminary injunction such as the one sought by petitioners is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This is particularly true where, as here, petitioners seek a mandatory injunction that would alter, rather than maintain, the status quo. *See Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.") (quotation marks omitted). To obtain an injunction, petitioners must establish that:

> (1) they are likely to succeed on the merits;
> (2) they are likely to suffer irreparable harm in the absence of preliminary relief;
> (3) the balance of equities tips in their favor; and
> (4) that an injunction is in the public interest.

*Winter*, 555 U.S. at 20; *see also Davis*, 571 F.3d at 1291. Petitioners bear the burden to show that "all four factors, taken together, weigh in favor of the injunction." *Davis*, 571 F.3d at 1292. In particular, petitioners must establish a likelihood of success on the merits; if they do not, the other factors are irrelevant. *See Apotex, Inc. v. FDA*, 449

F.3d 1249, 1253 (D.C. Cir. 2006) (concluding that plaintiff had "little likelihood of succeeding on the merits of its claim" and thus that the court had "no need to address the other preliminary injunction factors"); *see generally Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (stating that "we read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction") (quotation marks omitted); *Davis*, 571 F.3d at 1296 ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing *both* a likelihood of success *and* a likelihood of irreparable harm, among other things.") (Kavanaugh, J., concurring).

### B. Petitioners Cannot Demonstrate a Likelihood of Success on the Merits of Their Habeas Challenge to Their Medical Treatment and Conditions of Confinement

#### a. The Courts Lack Jurisdiction Over Petitioners' Conditions of Confinement and Treatment Claims

**1.a.** Federal courts are courts of limited subject matter jurisdiction. *See, e.g.*, *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 318 (D.C. Cir. 2012). Accordingly, for a federal court to exercise jurisdiction, "the Constitution must have supplied to the courts the capacity to take the subject matter and an Act of Congress must have supplied jurisdiction over it." *Id.* The rule that a court's jurisdiction must be established as a threshold matter "is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan*, 111 U.S. 379, 282 (1884)).

Here, through Section 7 of the Military Commissions Act of 2006 (MCA), 28 U.S.C. § 2241(e), Congress has exercised its constitutional prerogative to *withdraw* from the federal courts jurisdiction to adjudicate conditions of confinement and treatment claims by detainees at Guantanamo Bay:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, *treatment*, trial, or *conditions of confinement* of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant.

28 U.S.C. § 2241(e)(2) (emphasis added).[3]

By withdrawing jurisdiction over claims relating to detainees' conditions of confinement or treatment, members of Congress specifically intended to prevent detainees from raising claims related to the provision of medical care. *See, e.g.*, 152 Cong. Rec. S10375 (daily ed. Sept. 28, 2006) (Sen. Domenici) (noting conditions of confinement claims had been brought by detainees regarding "base security procedures, speed of mail delivery, and medical treatment"); 152 Cong. Rec. S10367 (daily ed. Sept. 28, 2006) (Sen. Graham) (same). Congressional proponents of the legislation were concerned that such claims would inappropriately consume resources and disrupt operations at the Guantanamo Bay Naval Base through litigation not

---

[3] Petitioners Aamer and Belbacha are being held pursuant to the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat 224 (Sept. 18, 2001), as informed by the laws of war. Petitioners Aamer and Belbacha may challenge the legality of their detention in accordance with *Boumediene v. Bush*, 553 U.S. 723 (2008).

related to the legality of the detainees' detention. *See, e.g.*, 152 Cong. Rec. S10268 (daily ed. Sept. 28, 2006) (Sen. Kyl).

This Court has held that § 2241(e)(2) is a valid exercise of congressional power. *See Al-Zahrani*, 669 F.3d at 318-19 (upholding the continuing applicability of § 2241(e)(2) bar to "our jurisdiction over 'treatment' cases"). And § 2241(e)(2) has been repeatedly applied by district courts in this Circuit to bar a variety of challenges to detainees' conditions of confinement and treatment, including claims related to the provision of medical care.[4] The district court thus correctly concluded that it lacked jurisdiction over the claims raised in petitioners' preliminary injunction motion.

**b.** Petitioners assert that, notwithstanding § 2241(e)(2), the district court had jurisdiction over their conditions of confinement and treatment claims because that section "bars only *non-habeas* relief, and in doing so makes habeas relief available to appellants as their only recourse for challenging conditions of their confinement that

---

[4] *Dhiab v. Obama*, No. 05-1457 (GK), 2013 WL 3388650 (D.D.C. July 8, 2013) (Kessler, J.) (request for injunction precluding involuntary feeding of hunger striking detainees); *Al Shurfa v. Obama*, No. 05-431 (RJL), 2009 WL 1451500 (D.D.C. May 21, 2009) (Leon, J.) (requests for transfer to less restrictive camp and to evaluate detainee's competence to dismiss his case); *Tumani v. Obama*, 598 F. Supp. 2d 67 (D.D.C. 2009) (Urbina, J.) (requests for transfer to less restrictive camp, to terminate interrogations, and to see father (who was another detainee)); *Al-Adahi v. Obama*, 596 F. Supp. 2d 111 (D.D.C. 2009) (Kessler, J.) (request to enjoin specific aspects of medical care and treatment provided to hunger striking detainees); *Khadr v. Bush*, 587 F. Supp. 2d 225 (D.D.C. 2008) (Bates, J.) (request for transfer to a rehabilitation and reintegration program); *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 312 (D.D.C. 2008) (Hogan, J.) (requests for mattress and blanket, for access to medical records, and to meet with detainee's treating military physician); *Al-Ghizzawi v. Bush*, No. 05-2378 (JDB), 2008 WL 948337 (D.D.C. April 8, 2008) (Bates, J.) (requests for transfer to civilian medical facility and for allegedly needed medical treatments).

deprive them of *substantial rights*." Brief of Appellants (Pet. Br.) at 20. But habeas is not an appropriate vehicle by which to adjudicate petitioners' conditions of confinement and treatment claims, and thus § 2241(e)(2) does bar petitioners' claims, however characterized.

Habeas actions have historically been understood as a vehicle for challenging only the fact of detention or its duration, not the conditions of a habeas petitioner's confinement. *See, e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring) (stating that a habeas claim "that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody" lies outside the "'core of habeas' [and] would utterly sever the writ from its common-law roots"); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."); *Brown v. Plaut*, 131 F.3d 163, 168–69 (D.C. Cir. 1997) ("*[R]equiring* the use of habeas corpus in such [conditions of confinement] cases would extend *Preiser[ v. Rodriguez*, 411 U.S. 475 (1973)] far beyond the 'core' of the writ that *Preiser* set out to protect."); *Preiser*, 411 U.S. at 484 ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.").

Consistent with this historical understanding, numerous courts have found that conditions of confinement claims that do not seek accelerated release from custody

are not within the scope of the writ.[5] Indeed, this Court itself has recognized that "the courts will not interfere with discipline or treatment in a place of legal confinement, and so habeas corpus is not an available remedy." *Miller v. Overholser*, 206 F.2d 415, 419 (D.C. Cir. 1953).[6]

It was against this backdrop that Congress enacted the MCA, which withdrew the courts' jurisdiction over (1) habeas actions filed by or on behalf of detainees and (2) any other action related to any aspect of the detainees' conditions of confinement or treatment, among other things. *See* 28 U.S.C. § 2241(e). While the Supreme Court held § 2241(e)(1) unconstitutional as applied to Guantanamo detainees such as

---

[5] *See, e.g.*, *Doe v. Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95, 100 n.3 (3d Cir. 2008) (noting that habeas is limited to "[a]ttacks on the fact or duration of the confinement" and does not include "[c]hallenges to conditions of confinement"); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006) (same); *Glaus v. Anderson,* 408 F.3d 382, 387-88 (7th Cir. 2005) (affirming district court dismissal of habeas petition challenging conditions of confinement and noting that "[w]hile the Supreme Court has left the door open a crack for habeas corpus claims challenging prison conditions, it has never found anything that qualified"); *Rael v. Williams*, 223 F.3d 1153, 1154 (10th Cir. 2000) ("[F]ederal claims challenging the conditions of . . . confinement generally do not arise under § 2241."); *Pischke v. Litscher*, 178 F.3d 497, 499 (7th Cir. 1999) (stating that habeas action is proper "only if the prisoner is seeking to 'get out' of custody in a meaningful sense"); *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) ("Habeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement," but not to "challeng[e] 'conditions of . . . confinement.'") (citation omitted).

[6] While the Court in *Miller* allowed the petitioner to challenge the legality of the place of his confinement in a hospital ward for the criminally insane—viewing that challenge as akin to a challenge to the fact of confinement, *e.g.*, 206 F.2d at 418 ("this habeas corpus proceeding . . . tests only the legality of his present confinement")— that distinction cannot help petitioners, who do not challenge the legality of their confinement.

petitioners in *Boumediene v. Bush*, 553 U.S. 723 (2008), § 2241(e)(2) still serves to divest the courts' jurisdiction over any actions that are not "proper claim[s] for habeas relief." *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009) ("The detainees' claims are not in the nature of an action barred by § 2241(e)(2) because, based upon longstanding precedents, it is clear they allege a *proper* claim for habeas relief, specifically an order barring their transfer to or from a place of incarceration.") (emphasis added). Because petitioners may not properly challenge their treatment or the conditions of their confinement by way of a habeas petition, their claims, however characterized, are barred by § 2241(e)(2).

**2.** Petitioners rely on a single Eighth Circuit case, *Willis v. Ciccone*, 506 F.2d 1011 (8th Cir. 1974), for the proposition that "habeas relief must be available to appellants to challenge conditions of their confinement that deprive them of substantial rights." Pet. Br. at 21 (emphasis omitted). *Willis*, however, is no longer good law, even in the Eighth Circuit, and its reasoning has been so thoroughly undermined that this Court should not follow it.

In *Willis*, the Eighth Circuit recognized that "[h]abeas corpus was originally viewed by this circuit, and several others, as an inappropriate method for challenging prison conditions." 506 F.2d at 1014. The court nevertheless held that a prisoner may bring a habeas challenge to prison conditions so long as the challenge "is limited to claims involving the deprivation of substantial rights." *Id.* at 1015. The court reasoned that such a departure from the court's traditional understanding of the role of habeas

21

was appropriate to remedy what it saw as "[t]he basic inequity of providing a remedy for state prisoners," who could challenge prison conditions under § 1983, while denying such a remedy to federal prisoners who, prior to *Bivens*, could not. *Id.* at 1014.

The perceived inequity underlying the Eighth Circuit's decision in *Willis* no longer exists, however, and the Eighth Circuit has more recently held that "[w]here [a] petitioner seeks a writ of habeas corpus and fails to attack the validity of his sentence or the length of his state custody, the district court lacks the power or subject matter jurisdiction to issue a writ." *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996). As one district court in the Eighth Circuit recognized, the rule that prisoners may not challenge the conditions of their confinement in a habeas petition "was the rule in the Eighth Circuit before *Willis* and appears to be the rule in the Eighth Circuit now, perhaps reflecting the fact that *Willis*'s rationale has been completely undermined by the Supreme Court's subsequent expansion of *Bivens* actions." *Taylor v. Roal*, No. 10-CV-3588 (PJS/JJG), 2010 WL 4628634, at *5 (D. Minn. Nov. 5, 2010).

Perhaps recognizing that *Willis* is no longer good law, even in the Eighth Circuit, petitioners would have this Court apply the *Willis* rule *only* to detainees at Guantanamo Bay. *See* Pet. Br. at 22 (explaining that, because of case law expanding the scope of *Bivens*, "*Willis* has lain fallow in recent years . . . But the *reasoning* of *Willis* remains sound for the Guantánamo Bay detainees"). According to petitioners, because § 2241(e)(2) strips them of their right to challenge the conditions of their confinement by way of anything other than a habeas action, "then a remedy must lie

22

in habeas corpus, for that is their 'only recourse.'" *Id.* (quoting *Willis*, 506 F.2d at 1014); *see also* Pet. Br. at 24 ("We submit that, by depriving the courts of jurisdiction over *Bivens* actions, § 2241(e)(2) operates to vest the courts with habeas jurisdiction to adjudicate such challenges.").

Not only would such a result be inconsistent with the prevailing rule that habeas may not be used to challenge a prisoner's conditions of confinement, but it would be antithetical to Congress' intent in enacting § 2241(e)(2). The plain language of that statute makes clear Congress' intent to prevent detainees from bringing actions "relating to any aspect of the[ir] detention, transfer, treatment, trial, or conditions of confinement[.]" 28 U.S.C. § 2241(e)(2). Were the statutory language not abundantly clear, the legislative history of § 2241(e)(2) further establishes the specific intent of the legislation's proponents to prevent detainees from raising claims related to the provision of medical care. *See, e.g.*, 152 Cong. Rec. S10375 (daily ed. Sept. 28, 2006) (Sen. Domenici) (noting conditions of confinement claims had been brought by detainees regarding "base security procedures, speed of mail delivery, and medical treatment"); 152 Cong. Rec. S10367 (daily ed. Sept. 28, 2006) (Sen. Graham) (same).

It cannot be that, by precluding detainees from bringing non-habeas claims related to their treatment or conditions of confinement, Congress intended to create (or, in petitioners' view, resuscitate) a right for them to do so by way of a habeas petition. This is particularly true given Congress' intent to preclude detainees from bringing *any* habeas claims whatsoever. *See* 28 U.S.C. § 2241(e)(1).

23

Nor does § 2241(e)(2) constitute an "unlawful suspension of the writ" when "construed as precluding injunctive relief that would be within the scope of habeas jurisdiction pursuant to the reasoning of *Willis*[.]" Pet. Br. at 23. As noted, *Willis*'s notion of the scope of habeas jurisdiction is no longer good law even in the Eighth Circuit, and this Court should not follow it. Furthermore, courts understood that habeas was not a proper vehicle for prisoners to challenge the conditions of their confinement well before prisoners were able to do so by way of a *Bivens* action.[7]

Moreover, the Suspension Clause, as construed in *Boumediene*, does not guarantee petitioners a judicial forum in which to present any and all grievances they may have with the quality of life provided them while in detention. *Boumediene* held that the system of review of detentions under the Detainee Treatment Act of 2005 did

---

[7] *See, e.g., Long v. Parker*, 390 F.2d 816, 818 (3d Cir. 1968) ("[H]abeas corpus is not a proper proceeding to investigate complaints by prisoners of mistreatment since such complaints do not attack the legality of the confinement."); *United States ex rel. Knight v. Ragen*, 337 F.2d 425, 426 (7th Cir. 1964) ("It is not the function of habeas corpus to direct prison officials in the treatment and care of inmates by mandatory injunction."); *Roberts v. Pegelow*, 313 F.2d 548, 551 (4th Cir. 1963) ("Such questions as these have consistently been held to be nonjusticiable, for routine security measures and disciplinary action rest solely in the discretion of the prison officials and their superiors in the Executive Department."); *Application of Hodge*, 262 F.2d 778, 780 (9th Cir. 1958) ("It is not the function of habeas corpus to correct cruelties and indignities imposed by guards upon prison inmates."); *Miller v. Overholser*, 206 F.2d 415, 419 (D.C. Cir. 1953) ("[T]he courts will not interfere with discipline or treatment in a place of legal confinement, and so habeas corpus is not an available remedy."); *Garcia v. Steele*, 193 F.2d 276, 278 (8th Cir. 1951) ("It is our opinion that the authority to classify federal prisoners for the purposes of confinement, care and treatment, has been conferred exclusively upon the Attorney General, and that his determinations, made in the exercise of that authority, are not subject to review in habeas corpus proceedings.").

not constitute an adequate substitute for habeas, and consequently that the jurisdictional bar to Guantanamo detainee habeas claims erected by 28 U.S.C. § 2241(e)(1) effected an unconstitutional suspension of the writ. 553 U.S. at 779, 792. But that conclusion followed only because the Suspension Clause guaranteed Guantanamo detainees "a meaningful opportunity to demonstrate that [they are] being held pursuant to [an] erroneous application or interpretation of relevant law." *Id.* at 779 (internal quotation marks and citation omitted). Neither the Suspension Clause nor *Boumediene* extends a similar guarantee when a detainee seeks to challenge the legality of enteral feeding.

Petitioners assert that "by depriving the courts of jurisdiction over *Bivens* actions, § 2241(e)(2) operates to vest the courts with habeas jurisdiction to adjudicate such challenges." Pet. Br. at 24. This view is both directly contrary to Congress' intent in enacting the MCA and violates the longstanding rule that habeas actions may not properly be used to challenge prisoners' treatment or conditions of confinement. Far from constituting an unlawful suspension of the writ, § 2241(e)(2) simply removes the courts' jurisdiction over all claims that are not "proper claim[s] for habeas relief." *Kiyemba*, 561 F.3d at 513. Petitioners' challenges to their treatment and conditions of confinement are not properly brought via habeas petition, and thus the courts lack jurisdiction over those claims by operation of § 2241(e)(2).

**3.** Petitioners further assert that the court has jurisdiction over their injunction motion because they "assert habeas jurisdiction to review a quantum change in the

level of custody in which they are being held." Pet. Br. at 24 (emphasis omitted). According to petitioners, because hunger striking detainees are transferred from communal living quarters to single cells, petitioners' "force-feeding is reviewable via habeas corpus." Pet. Br. at 25.

Petitioners' argument attempts to recast the nature of the claims they presented to the district court, which did not challenge the "level of custody" in which petitioners are being held. Although petitioners allege that JTF-GTMO has made the discretionary decision to house hunger striking detainees separately from other detainees, petitioners are not challenging that particular decision—*i.e.*, they are not asking to be moved to a communal environment. Rather, in the motion at issue, petitioners requested "a preliminary injunction prohibiting respondents from subjecting petitioners to force-feeding of any kind, including forcible nasogastric tube feeding, and from administering medications related to force-feeding without the petitioners' consent." App. 1. And petitioners' motion for an emergency injunction requested an injunction "prohibiting respondents from depriving petitioners of their right to preform nightly communal Ramadan prayers unless they stop hunger-striking." App. 168. Neither of these requests implicates—nor would granting them require—a "quantum change in the level of custody" in which petitioners are being held.

As the Seventh Circuit explained in *Graham v. Broglin*, the case relied upon by petitioners, "[i]f a prisoner seeks by his suit to shorten the term of his imprisonment,

he is challenging the state's custody over him and must therefore proceed under the
habeas corpus statute . . . while if he is challenging merely the conditions of his
confinement his proper remedy is under civil rights law[.]" 922 F.2d 379, 380-81 (7th
Cir. 1991)). The court generalized:

> If the prisoner is seeking what can fairly be described as a quantum
> change in the level of custody—whether outright freedom, or freedom
> subject to the limited reporting and financial constraints of bond or
> parole or probation, or the run of the prison in contrast to the
> approximation to solitary confinement that is disciplinary segregation—
> then habeas corpus is his remedy. But if he is seeking a different
> program or location or environment, then he is challenging the
> conditions rather than the fact of his confinement and his remedy is
> under civil rights law, even if, as will usually be the case, the program or
> location or environment that he is challenging is more restrictive than
> the alternative that he seeks.

*Id.* at 381.

Petitioners here are not seeking a quantum change in the level of their custody;
they are seeking an order requiring the government to cease feeding them
involuntarily and allowing them to pray communally, wherever they are located. This
is akin to "a different program or location or environment," even if the enteral
feeding program petitioners are challenging "is more restrictive than the alternative
that [they] seek[ ]." *See Khadr v. Bush*, 587 F. Supp. 2d 225, 237 (D.D.C. 2008) (holding
that Guantanamo detainee's request for a transfer from adult detention into a
rehabilitation and reintegration program for juveniles "is programmatic" and thus not
a cognizable habeas action). As Justice Scalia has noted, "[i]t is one thing to say that
permissible habeas relief, as our cases interpret the statute, includes ordering a

'quantum change in the level of custody,' *Graham v. Broglin*, . . . , such as release from incarceration to parole. It is quite another to say that the habeas statute authorizes federal courts to order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody." *Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring). But that is precisely what petitioners seek: an order "prohibiting respondents from subjecting petitioners to force-feeding of any kind, including forcible nasogastric tube feeding," App. 1, which would neither terminate petitioners' custody, accelerate the date of their release from custody, nor reduce the level of their custody. Respondents' alleged decision to house hunger striking detainees in single cell living does not somehow transform the enteral feeding program from a condition of petitioners' confinement into a quantum change in their level of custody.

Even if it did, or even if petitioners had requested a transfer from single cell living to a communal living arrangement, petitioners still would not have stated a claim reviewable through habeas. *See, e.g.*, *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 873 n.7 (1st Cir. 2010) ("When an inmate seeks a change from segregation into the general prison population, that claim must proceed under § 1983 because, under *Sandin*[ *v. Conner*, 515 U.S. 472 (1995)], the quantum change in custody is insufficient."); *Bunn v. Conley*, 309 F.3d 1002, 1008 (7th Cir. 2002) ("[C]hanges in levels of security within a prison, or changes from one prison to another, . . . cannot be attacked using the habeas corpus statutes."); *see generally Sylvester v. Hanks*, 140 F.3d 713, 714 (7th Cir.

28

1998) ("Although dramatically more restrictive confinement may be contested in a collateral attack under § 2254, *see Graham v. Broglin*, 922 F.2d 379 (7th Cir. 1991), recent cases such as *Sandin* . . . imply that the difference between a prison's general population and segregation does not implicate a 'liberty' interest—and therefore could not be 'custody' for purposes of § 2254."). Petitioners thus cannot establish the courts' jurisdiction over their habeas challenge to their treatment and conditions of confinement by asserting (incorrectly) that they seek "a quantum change in the level of custody in which they are being held." Pet. Br. at 24 (emphasis omitted).

**4.** Petitioners' third attempt to establish the courts' jurisdiction over their habeas challenge to their treatment and conditions of confinement relies on an assertion that involuntary feeding "constitutes a severe restraint on individual liberty" that "is within the scope of the Great Writ." Pet. Br. at 26 (emphasis omitted).

As an initial matter, it is not clear that petitioners in fact have a "constitutionally-protected [sic] liberty interest in avoiding unwanted medical treatment." Pet. Br. at 26. *Sell v. United States*, the case cited by petitioners for the proposition that they have such a constitutionally protected interest, reiterated that individuals have "a constitutionally protected liberty 'interest in avoiding involuntary administration of antipsychotic drugs[.]'" 539 U.S. 166, 178 (2003) (quoting *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)). But the right asserted by petitioners to commit suicide by starvation while in respondents' custody is not a fundamental liberty interest. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) ("[T]he asserted 'right' to

29

assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause."); *Von Holden v. Chapman*, 450 N.Y.S.2d 623, 625 (N.Y. App. Div. 1982) ("[I]t is self-evident that the right to privacy does not include the right to commit suicide.").

In any event, *Hensley v. Municipal Court, San Jose Milpitas Judicial District, Santa Clara County*, 411 U.S. 345 (1973), the case relied upon by petitioners for the proposition that the courts have jurisdiction over their preliminary injunction motion, did not create a special category of habeas jurisdiction for any challenge involving "a severe restraint on individual liberty." Instead, it concluded that the petitioner at issue—a prisoner released on his own recognizance—was "in custody" for purposes of the habeas corpus statute because the petitioner (1) was subject to restraints not shared by the general public; and (2) remained at large only because of stays entered by the courts, without which the petitioner would have been in custody. *Hensley*, 411 U.S. at 351-52. *Hensley* is thus "best understood as interpreting 'custody' to include those cases where a criminal defendant, already convicted and sentenced, would be imprisoned without further state judicial action had not the prison sentence been stayed by the federal court on habeas." *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 327 (1984) (Powell, J. concurring).

As previously discussed, the courts lack jurisdiction over petitioners' challenge because § 2241(e)(2) removes the courts' jurisdiction over all claims that are not "proper claim[s] for habeas relief." *Kiyemba*, 561 F.3d at 513. Petitioners' challenges to

30

their treatment and conditions of confinement are not properly brought via habeas petition, and thus the courts lack jurisdiction over those claims by operation of § 2241(e)(2). Because this conclusion in no way turns on whether petitioners are "in custody" for the purposes of the federal habeas statute, *Hensley* is irrelevant to this case.

**5.** Petitioners' final attempt to establish the courts' jurisdiction over their habeas challenge to their treatment and conditions of confinement relies on *Zivotofsky v. Secretary of State*, No. 07-5347, __ F.3d__, 2013 WL 3799663 (D.C. Cir. July 23, 2013), which petitioners cite in a 28(j) letter submitted on August 8, 2013. Petitioners rely on *Zivotofsky* for the proposition that a Provisional Agreement between the United States and Saudi Arabia dated November 7, 1933, allows petitioner Aamer to challenge the conditions of his confinement by invoking international law.

*Zivotofsky*, which dealt with "the President's exclusive authority under the United States Constitution to decide whether and on what terms to recognize foreign nations," 2013 WL 3799663, at *1, is irrelevant to this case. As an initial matter, petitioners did not argue in the district court or in their opening brief that the President's "recognition" authority affected the federal courts' jurisdiction in this case, and therefore that argument is waived. *See, e.g., Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 779 (D.C. Cir. 2012) (holding that appellant waived argument because it was not raised in either the district court or in the appellant's opening brief). Even on the merits, petitioners' reliance on *Zivotofsky* is misplaced. That case held that the

31

President "exclusively holds the power to determine whether to recognize a foreign sovereign." *Id.* at *12. It does not address the scope of the federal courts' jurisdiction.

### b. Events That Occurred During the Pendency of This Appeal Have Rendered Petitioner Hadjarab's Claims Moot

This Court lacks jurisdiction over the claims brought by petitioner Hadjarab for a second, independent reason: events that occurred during the pendency of this appeal have rendered Hadjarab's claims moot. Petitioner Hadjarab has been transferred from Guantanamo Bay to the custody of the Government of Algeria, rendering his underlying habeas suit, and the claims he raises on appeal regarding his treatment at Guantanamo Bay, moot. *See Gul v. Obama*, 652 F.3d 12 (D.C. Cir. 2011). Indeed, the district court has already dismissed Hadjarab's underlying habeas petition as moot. *Hadjarab v. Obama*, 05-CV-1504 (RMC) (Order, Dkt. No. 314) (August 29, 2013).

### c. Even if the Courts Had Jurisdiction Over Petitioners' Preliminary Injunction Motion, Petitioners Have Not Established a Likelihood of Success on the Merits of Their Underlying Claims

#### i. *Courts have consistently held that the government has a legitimate interest in involuntarily feeding hunger striking prisoners*

On the merits, petitioners assert that respondents have no legitimate penological interest in feeding petitioners involuntarily, *see, e.g.* Pet. Br. at 30 (arguing that "there cannot be a legitimate penological interest in detaining appellants indefinitely, or in forcibly administering nutrition so as to prolong that detention")— in other words, that the government has no legitimate interest in providing petitioners

with life-saving nutritional and medical care that prevents them from committing suicide by starvation while in the government's custody. Not surprisingly, petitioners cite no legal authority supporting that remarkable proposition. Nor is there any: as the district court recognized, courts have consistently found that "[t]he Government has a legitimate penological interest in preventing suicide, and the involuntary feeding of hunger-striking prisoners and detainees has been repeatedly upheld." Op. at 13, App. 154 (citing cases).

**1**. In *Turner v. Safley*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights,[8] the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). Even assuming for the sake of argument that the *Safley* standard, which was developed in the domestic prison context, applies to Guantanamo Bay, a military base that houses numerous foreign enemy combatants, applies here, petitioners are not likely to succeed on the merits of their claims.

Under the *Safley* standard, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This is especially the case in the area of medical care. *See, e.g.*, *Inmates of Allegheny Cnty.*

---

[8] Petitioners nowhere address what substantive constitutional rights they possess, if any. *See Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009).

33

*Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (stating that federal courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment" chosen by prison doctors) (quotation marks omitted); *Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir. 1970) ("Obviously, courts cannot go around second-guessing doctors."). And such deference is particularly appropriate here, where the professional judgment being exercised is that of a military commander in charge of safety on a military base that holds numerous foreign enemy combatants.

Courts have repeatedly recognized the government's legitimate interest in providing life-saving nutritional and medical care in order to preserve the life and prevent suicidal acts of individuals in its care and custody. *See generally In re Soliman*, 134 F. Supp. 2d 1238, 1255-56 (N.D. Ala. 2001) (noting that that "Federal Courts generally have approved of force-feeding hunger striking inmates . . . State courts also have upheld the right to force-feed hunger-striking prisoners"), *vacated as moot*, 296 F.3d 1237 (11th Cir. 2002); Op. at 13, App. 154 (citing cases). For example, the Second Circuit has held that involuntary feeding is supported by "compelling governmental interests, such as the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline[.]" *In re Grand Jury Subpoena*, 150 F.3d 170 (2d Cir. 1998) (per curiam); *see also Bezio v. Dorsey*, 989 N.E.2d 942, 950 (N.Y. 2013) ("[T]here is virtually universal recognition among appellate courts that an inmate hunger strike can have a significant destabilizing impact on the institution[.]"). Finding no constitutional violation when a prison threatened to feed a fasting inmate

34

involuntarily, the Eighth Circuit has recognized that "preservation of prisoners' health is certainly a legitimate objective, and prison officials may take reasonable steps to accomplish this goal." *Garza v. Carlson*, 877 F.2d 14, 17 (8th Cir. 1989). And the Seventh Circuit has concluded that "either prisoners don't have such an interest [in committing suicide], or it is easily overridden." *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006). The reasons for this, the court noted "are practical. . . . If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners. Prison officials who let prisoners starve themselves to death would also expose themselves to lawsuits by the prisoners' estates." *Id.* at 547; *see generally Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012) (damages lawsuit against government officials related to suicide of Guantanamo Bay detainees). The district court thus correctly concluded that petitioners have not shown a likelihood of success on the merits of their claim because the government has a legitimate interest in providing life-saving nutritional and medical care: "As his custodian, the United States cannot 'allow' any person held in custody to starve himself to death." Op. at 13, App. 154.

    **2.a.** Petitioners attempt to distinguish their case as one involving "indefinite detention," Pet. Br. at 29-30; according to petitioners, "force-feeding to prolong such detention cannot serve any legitimate penological interest," *id.* at 32; *see also id.* at 39 ("The indefinite nature of appellants' detention distinguishes this case from a line of cases that have approved force-feeding of hunger-striking prisoners as reasonably

related to the legitimate penological interest in maintaining prison security and discipline."). But respondents' legitimate interests in preserving life, preventing suicide, and enforcing prison security and discipline are in no way dependent on the length or status of petitioners' detention—indeed, if accepted, petitioners' argument would bar prison administrators from preventing the suicide of any person with a life sentence. Moreover, multiple courts have rejected challenges to involuntary feeding brought by prisoners who claimed they were subject to indefinite detention. *See In re Grand Jury Subpoena*, 150 F.3d at 171; *In re Soliman*, 134 F. Supp. 2d at 1245, 1258. In each case, the court concluded that the government had legitimate interests in preserving life and maintaining order and safety regardless of the status of the prisoner's detention. *See generally In re Soliman*, 134 F. Supp. 2d at 1255 ("Federal Courts generally have approved of force-feeding hunger striking inmates, regardless of whether the person was a convicted prisoner, a pre-trial detainee, or a person held pursuant to a civil contempt order."). The fact that petitioners are presently detained pursuant to the Authorization for the Use of Military Force, as informed by the laws of war, as opposed to a criminal conviction or authority, is irrelevant to the question whether respondents have a legitimate interest in administering life-saving nutrition and medical care to preserve petitioners' health and life.

    **b.** Petitioners separately claim that enteral feeding "is inhumane, degrading and a violation of medical ethics," Pet. Br. at 33-34, and that it "can be extremely painful," *id.* at 37. Those assertions are not only incorrect, but they do not undercut

36

respondents' legitimate interests in preserving petitioners' lives, safeguarding the health of all detainees, and maintaining order and safety at Guantanamo Bay. Nor do petitioners' assertions establish that feeding petitioners enterally is not reasonably related to those legitimate interests. *See generally Safley*, 482 U.S. at 89 ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests").

While petitioners claim that they "do not wish to die," Pet. Br. at 38, petitioners do not dispute that respondents are feeding petitioners enterally in order to keep them alive, and that such feeding is necessary to do so. *See, e.g.*, Statement of Petitioner Hadjarab, App. 39-40 ("I do not want to die, but I am prepared to. . . [M]y situation is so serious now I am willing to sacrifice my body and my health. . . . I am *prepared* to die"); Statement of Petitioner Belbacha, App. 35 ("I am participating in this hunger strike of my own free choice and am fully aware of the negative consequences which a long-term strike could have on my health."). Rather than claiming that enteral feeding is unnecessary to preserve petitioners' lives, petitioners assert that "there are *ready alternatives* to such force-feeding: *promptly bring the detainees to trial or military commission proceedings*, the absence of which is the reason why they are hunger striking. Those alternatives make their force-feeding unreasonable." Pet. Br. at 40. This is an argument challenging petitioners' detention; it does not address the merits of respondents' decision to feed petitioners enterally. As the district court recognized, in making this argument, petitioners are "using their motion for preliminary injunction

as a vehicle for challenging their detention. . . . Petitioners, in fact, are seeking trial or release; that relief is properly the basis of their habeas petitions." Op. at 9-10, App. 150-51.

In any event, the district court did not abuse its discretion in concluding that "there is nothing so shocking or inhumane in the treatment of Petitioners—which they can avoid at will—to raise a constitutional concern that might otherwise necessitate review." *Id.* at 7, App. 148. JTF-GTMO's hunger strike protocol follows the Federal Bureau of Prisons' model and guidelines for managing hunger strikers. SMO Decl. ¶ 9, App. 93. A hunger striking detainee is only fed enterally once the detainee's refusal to consume food or nutrients voluntarily reaches the point where JTF-GTMO medical staff determines that the detainee's life or health could be threatened. *Id.* ¶ 11, App. 94. Even then, prior to every feeding, the detainee is offered the opportunity to eat a meal or consume a liquid nutritional supplement orally, instead of being enterally fed. *Id.* If enteral feeding is necessary, it is administered in a humane manner through a nasogastric tube, and only when medically necessary to preserve the detainee's health or life. *Id.* ¶ 12, App. 94. The process is never undertaken in a fashion intentionally designed to inflict pain or harm on the detainee. *Id.* ¶ 15, App. 95. To the contrary, the detainee's comfort and safety is a priority for the medical staff. *Id.*

Nothing about the process described above constitutes "torture" or "cruel, inhuman, and degrading treatment or punishment." Pet. Br. at 34. None of the many

courts that have rejected challenges to the involuntary feeding of prisoners have suggested that the involuntary feeding process constitutes torture or punishment. Indeed, the Eighth Circuit has concluded that "[t]he mere allegation of forced-feeding does not describe a constitutional violation." *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992). Nor is there any suggestion that respondents have acted with deliberate indifference to petitioners' medical needs. *See generally Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (applying deliberate indifference standard to Eighth Amendment claims involving prisoners' medical care and conditions of confinement); *O.K. v. Bush*, 344 F. Supp. 2d 44, 60-63 & n.23 (D.D.C. 2004) ("Without concluding that the 'deliberate indifference' doctrine" applies to challenges to Guantanamo detainee medical care, "the Court will draw on this well-developed body of law to guide its analysis"). Quite the opposite: respondents are acting appropriately and humanely in response to petitioners' attempt to starve themselves to death. *See, e.g.*, *Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) ("[A]t some point in Freeman's meal-skipping the prison doctors would have had a duty and certainly a right to step in and force him to take nourishment.").

Nor are petitioners correct in their suggestion that enteral feeding is "out of step with international norms." Pet. Br. at 39 (quotation marks omitted). The International Criminal Tribunal for the Former Yugoslavia (ICTY), for example, has ordered a hunger striking detainee to be involuntarily fed "with the aim of protecting the health and welfare of the Accused and avoiding loss of life[.]" *Prosecutor v. Šešelj*,

Case No. IT-03-67-T, Urgent Order to the Dutch Authorities Regarding Health and Welfare of the Accused, at 6 (Dec. 6, 2006) (Urgent Order). The ICTY explained that "according to jurisprudence of the European Court of Human Rights, 'force-feeding' does not constitute torture, inhuman or degrading treatment if there is a medical necessity to do so, if procedural guarantees for the decision to force-feed are complied with and if the manner in which the detainee is force-fed is not inhumane or degrading." *Id.* at 5 (citing *Nevmerzhitsky v. Ukraine*, ECHR Judgment, Application No. 54825/00 (Oct. 12, 2005). The ICTY also noted that detainees may be fed involuntarily in countries such as Germany, Austria, and Australia. *See* Urgent Order at 5 n.13. More recently, it has been recognized in the Copenhagen Process on the Handling of Detainees in International Military Operations that "[m]edical assistance should, wherever possible, be undertaken with the consent of the wounded or sick detainee" but that "medical actions to preserve the health of the detainee may be justified even where the detainee refuses to provide consent." [9] Chairman's Commentary to the Copenhagen Process: Principles and Guidelines *available at* http://um.dk/en/~/media/UM/English-site/Documents/Politics-and-diplomacy/ Copenhangen%20Process%20Principles%20and%20Guidelines.pdf.

---

[9] The Copenhagen Process was a five year process led by the Government of Denmark to develop best practices on the handling of detainees in international military operations and involved, among others, representatives from 24 countries.

*ii.  Petitioners' RFRA claim is moot and has no merit*

**1.** Separate from their claims regarding enteral feeding, petitioners argue that respondents deprived them of "the right to perform communal *tarawih* prayers during Ramadan," in violation of the Religious Freedom Restoration Act (RFRA). Pet. Br. at 41. Although Ramadan ended on August 7, 2013, petitioners assert that this claim is not moot because it is capable of repetition yet evading review. *Id.* at 44-45. Petitioners' argument in this regard is based solely on their conclusion that "given the lengthy history of indefinite detention at Guantánamo Bay, we can reasonably expect that one or more of the appellants will still be detained eleven months from now at the start of Ramadan in 2014 and at that time will again be threatened with deprivation of the ability to pray communally." *Id.*

Petitioners' mootness argument largely ignores the confluence of events that would need to occur for them to again be subject to the same treatment next Ramadan, which begins June 28, 2014. Almost a year from now, these three petitioners would need (1) to remain in custody in Guantanamo Bay, despite all having been approved for transfer, *see In re Guantanamo Bay Detainee Litig.*, 08-MC-442 (TFH) (Notice) (Dkt. No. 1991) (Sept. 21, 2012); (2) to engage in a hunger strike during Ramadan; (3) to be hunger striking to the point that they are approved for enteral feeding; and (4) to be subject to the same policies that allegedly prevent them from participating in communal *tarawih* prayers, despite the fact that, as petitioners allege, these policies have changed over time, *see* Appellants' Reply to Respondents'

Opposition to <u>Emergency Motion</u> For An Injunction Pending Appeal (Doc. No. 1448689), Exhibit A at 2 ("At the beginning of Ramadan they gave us the right to be together for several hours a day. But after a few days, they changed this."). Because petitioners have produced no evidence establishing that these conditions will be met next Ramadan, they have failed to meet their burden of showing that there is a reasonable expectation that they will be subject to the same action again. *See generally Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (noting that it is the plaintiff's burden to establish that the necessary circumstances are present). Accordingly, petitioners' RFRA claim is moot.

**2.** Even if petitioners' RFRA claim were not moot, petitioners are not likely to succeed on the merits of this claim because, as non-resident aliens, they do not fall within the category of "persons" protected by RFRA. In *Rasul v. Myers*, this Court directly held that, as a matter of statutory interpretation, non-resident aliens do not fall within the category of "persons" protected by RFRA. 563 F.3d 527, 532-33 (D.C. Cir. 2009).

Petitioners recognize this Court's holding in *Rasul*, but assert that "*Citizens United*[ *v. FEC*, 558 U.S. 310 (2010)] revives the issue addressed in *Rasul v. Myers* and makes it an open question whether the RFRA's protection extends to non-resident aliens." Pet. Br. at 42. But *Rasul* held "that the term 'person' as used in RFRA should be read consistently with similar language in constitutional provisions, as interpreted by the Supreme Court *at the time Congress enacted RFRA*" in 1993. 563 F.3d at 533

42

(emphasis added). Congress's express purpose in enacting RFRA was to "*restore* the compelling interest test" as it existed prior to 1990. 42 U.S.C. § 2000bb(b)(1) (emphasis supplied); *see also Bensenville v. FAA*, 457 F.3d 52, 62 (D.C. Cir. 2006) (stating that, with RFRA, Congresses intended to " 'restore' the standard by which federal government actions burdening religion were to be judged, not to expand the class of actions to which the standard would be applied.") (internal citations omitted). The Supreme Court's 2010 decision in *Citizens United* thus can have no bearing on Congress's intent in using the term "person" in RFRA, which was enacted 17 years before *Citizens United* was decided. Petitioners are therefore certain not to succeed on the merits of their underlying RFRA claim because, as non-resident aliens, they are not protected under RFRA.

### C. Petitioners Have Not Demonstrated Irreparable Harm

Petitioners' brief spends only a single sentence on the irreparable harm petitioners claim they would suffer in the absence of their requested injunction: "Without an injunction, appellants will be irreparably injured by force-feeding that is painful, inhumane, degrading and medically unethical, as well as by the deprivation of the fundamental right to religious free exercise." Pet. Br. at 46. But the enteral feeding to which petitioners object—which, as noted above, is undertaken in a humane manner, only when medically necessary to preserve the detainee's health or life, and never in a fashion intentionally designed to inflict pain or harm on the detainee, *see supra* at 38-39—prevents petitioners from starving themselves to death, provides them

with adequate nutrition and keeps them in good health. *See* SMO Decl. ¶¶ 21-23, App. 96-97. Under these circumstances, as the district court correctly recognized, "the requested injunction would[, in fact,] *increase* the risk of irreparable harm to Petitioners' lives and health . . . . If an injunction were granted, Petitioners would be permitted to refuse food and endanger their lives and health, possibly to the point of death." Op. at 14, App. 155 (emphasis added). Petitioners thus cannot establish that they would suffer irreparable harm in the absence of the relief they request. *Cf. Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006) ("[E]ither prisoners don't have such an interest [in committing suicide], or it is easily overridden.").

### D. The Balance of Harms and the Public Interest Weigh Decisively Against the Relief Petitioners Seek

The balance of harms and public interest also weigh against granting the relief sought by petitioners. In addition to the harm petitioners will suffer if the injunction they seek is granted and they must be allowed to refuse food, even to the point of death, respondents will suffer harm in several respects. Respondents will suffer harm if they are prohibited from administering treatment that, in their professional medical judgment, they are obligated to provide to individuals, held in their custody, for whose health and well-being they are responsible. *See Garza v. Carlson*, 877 F.2d 14, 17 (8th Cir. 1989) (recognizing that "preservation of prisoners' health is certainly a legitimate objective, and prison officials may take reasonable steps to accomplish this goal"); Op. at 13, App. 154 ("As his custodian, the United States cannot 'allow' any person

held in custody to starve himself to death. Whatever the medical ethics for a person at liberty, the United States as custodian has additional obligations."). And, contrary to petitioners' assertion that respondents "can hardly be injured if detainees . . . refuse to eat," Pet. Br. at 46, further injury will befall respondents as any deaths of hunger striking detainees will undermine the security and good order of the Guantanamo Bay detention facility, threatening the safety of detainees and prison personnel alike. *See Freeman*, 441 F.3d at 546 ("If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners."); *Bezio v. Dorsey*, 989 N.E.2d 942, 950 (N.Y. 2013) ("[T]here is virtually universal recognition among appellate courts that an inmate hunger strike can have a significant destabilizing impact on the institution[.]").

For the same reasons, the public interest lies with maintaining the status quo. The public interest surely lies in preserving the health and safety of persons held in government care and custody, for whose welfare the public has assumed responsibility, and in avoiding the threat to good order, and to the safety of detainees and military personnel alike, should hunger striking detainees be allowed to perish. *See* Op. at 14, App. 155 ("If an injunction were granted, Petitioners would be permitted to refuse food and endanger their lives and health, possibly to the point of death. This would be contrary to the Government's duty to provide life-saving medical care to persons in custody and would undermine the security and safety of the Guantanamo facility and the detainees housed there."). While petitioners assert that "[t]he Nation's

45

best interest lies in its government . . . ending indefinite detention at Guantánamo Bay by either prosecuting those detainees who should be prosecuted or releasing those who have been cleared for release," Pet. Br. at 46, the relief they seek in the motion at issue is not their prosecution or release, but is instead an order that would preclude the government from providing petitioners with life-saving nutritional and medical care that prevents them from committing suicide by starvation while in the government's custody. There is no public interest in such an outcome. Given the potentially dire consequences that could flow from granting petitioners' motion, the balance of harms and the public interest clearly weigh against the relief petitioners seek.

## CONCLUSION

For the foregoing reasons, the district court's denial of petitioners' motions for preliminary injunction should be affirmed.

STUART F. DELERY
 Assistant Attorney General

DOUGLAS N. LETTER
 (202) 514-3602
MATTHEW M. COLLETTE
 (202) 514-4214

  */s/Daniel J. Lenerz*
DANIEL J. LENERZ
 (202) 514-0718
 Attorneys, Appellate Staff
 Civil Division, Room 7242
 U.S. Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, D.C. 20530-0001

September 2013

47

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a) OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify, pursuant to Fed. R. App. P. 32(a), that the foregoing brief contains 12,000 words, according to the count of Microsoft Office Word 2010.


_/s/Daniel J. Lenerz_
Daniel J. Lenerz
Attorney for Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September 2013, I filed the foregoing Brief for Appellees with the Court by CM/ECF. I also hereby certify that the participants in the case are registered CM/ECF users and will be served via the CM/ECF system.


  */s/Daniel J. Lenerz*
Daniel J. Lenerz
Attorney for Appellees